COMMANDER JERRY CUNNINGHAM, CHIEF OF DETECTIVES OF THE LAS VEGAS METROPOLITAN POLICE DEPARTMENT, PETITIONER, v. EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR CLARK COUNTY AND THE HONORABLE PAUL GOLDMAN, DISTRICT COURT JUDGE, DEPARTMENT X, RESPONDENT.

No. 17627

December 10, 1986                    729 P.2d 1328

*Robert J. Miller,* District Attorney, and *Charles K. Hauser,* Deputy District Attorney, Clark County, for Petitioner.

*Morse & Mowbray* and *Christopher H. Byrd,* Las Vegas, for KLAS-TV, Inc.

## OPINION

*Per Curiam:*

This petition for a writ of prohibition or, alternatively, a writ of habeas corpus, challenges a purported order of the respondent District Court Judge Paul S. Goldman. The order held petitioner, Commander Jerry Cunningham, Chief of Detectives of the Las Vegas Metropolitan Police Department, in direct contempt of court, and sentenced him to jail "for 48 hours or until further order of the court, whichever occurs last." Because the record reflects that Judge Goldman acted without any jurisdiction whatever, misusing and abusing his judicial authority, we vacate his purported order and grant petitioner Cunningham's request for a writ of prohibition.

On October 6, 1986, at approximately 11:00 p.m., a man named Hajo Harms jumped from an airplane to his death. Harms had previously paid several individuals, including two photographers, to videotape and witness his fall from the airplane, apparently without the benefit of a parachute. The group flew to a location over the desert where, during the flight, Harms opened

the door and fell from the airplane at an altitude of 9500 feet. All of the people remaining on board the aircraft believed that Harms had fallen to his death, as it did not appear to them that Harms was wearing a parachute. Upon returning to the airport, the group immediately reported the incident to the Las Vegas Metropolitan Police Department, which seized the video tapes as evidence. As reflected by police investigative reports, Harms had previously purchased the video tapes from the photographers and, prior to take-off, had marked each tape with the words, "This is the personal property of Joe H. Harms, viewing or copying is prohibited."

By the afternoon of October 8, 1986, Harms' body was found in the desert area. Thereupon, it was learned that he in fact had been wearing a small, concealed parachute which malfunctioned, and that he had been killed as a result of the fall. Not far distant from where the body was found, a vehicle was parked. The doors of the vehicle were locked and two flashlights with dead batteries were found on the dashboard pointed skyward through the front windshield. The vehicle was later determined to be registered to Hajo Harms. Harms had apparently determined the location at which to jump from the airplane by following major roadways and spotting the flashlights shining through the windshield at night. Had Harms' ploy worked as planned, he presumably would have gotten into his vehicle, driven away, and given the impression that he had fallen to his death.

It appeared to the police that Harms had perpetrated a deception upon those who accompanied him in the aircraft, and upon the public by documenting the incident on video tapes. Consequently, Commander Cunningham believed that an investigation should be conducted to discover what motivated his act. Cunningham reasoned that Harms had conceivably acted (1) to gain publicity; (2) to escape the judicial process by establishing, for example, that he was undoubtedly dead as a result of the fall; or (3) to facilitate an insurance fraud scheme. Commander Cunningham believed that a complete investigation was essential and that the video tapes were evidence.

On October 8, 1986, at approximately 3:30 p.m., Commander Cunningham learned of the discovery of Harms' body from Undersheriff Cooper, who phoned Cunningham to inquire about releasing the video tapes to the news media. Cunningham reportedly told Cooper that he did not think it was appropriate to release the video tapes since there had not been any notification of the next of kin, and public identification of the victim through the airing of the video tapes would therefore be prohibited. Additionally, Cunningham stated that he considered the tapes evidence in a death investigation. Shortly thereafter, at 4:20 p.m., Commander Cunningham received a call from Mark Fierro, a reporter

with KLAS-TV, Inc., inquiring about the possibility of obtaining a copy of the tapes. (By this time, Cunningham's detectives had formulated a hypothesis, based on finding slits in Harms' unopened parachute, to the effect that perhaps the chute had been sabotaged.) Commander Cunningham told Fierro that he considered the tapes evidence in a death investigation and that, therefore, he would not release them. Cunningham thereafter left his office for the day.

Fierro then verbally contacted Judge Goldman to discuss the release of the tapes, and provided Judge Goldman with Cunningham's telephone number. At approximately 4:25 p.m., Judge Goldman telephoned the Las Vegas Metropolitan Police Department and demanded to speak to Commander Cunningham. Upon being informed that Commander Cunningham had left the office for the day, Judge Goldman told Cunningham's secretary that if Cunningham did not appear at the courthouse in ten minutes, he would have Cunningham arrested. According to Cunningham's secretary, Judge Goldman did not properly identify himself, was rude and belligerent on the telephone, and had hung up abruptly without allowing the secretary to verify his name (the secretary thought the irate caller said he was "George Goldman") and without leaving a number at which Cunningham could return the call. Judge Goldman did not identify the purpose of his call, nor did the caller state that it was in relation to any specific case pending before the district court. Commander Cunningham, who had not yet left the police station, checked with his secretary shortly before 5:00 p.m. and received the message that "George Goldman," or possibly Judge Goldman, had called. The secretary's written message recited as follows:

TO: Cmdr.
DATE: 10/8/86   TIME: 4:25 P.M.
MESSAGE FOR YOU
MR. George (?) Goldman
OF: (Possibly Judge Goldman)
PHONE: Left none   EXT.............
MESSAGE:

Said that if you weren't enroute to the Court in 10 minutes that he would have you arrested.

This person was very rude. He said what he had to say and then hung up before I could verify his name, get a phone #, find out if he was crazy, or what. He gave his name twice and both times it sounded like George Goldman, although "Judge" would make more sense, probably.

CLF

Cunningham did not attempt to respond at that time.

Subsequent investigation revealed that Judge Goldman's secretary recalls overhearing the judge yelling at someone over the telephone at approximately 4:28 p.m. that day. She too heard him tell the other party on the telephone that he (Judge Goldman) was going to have Commander Cunningham arrested if he did not return his call. Additionally, Judge Goldman's bailiff related that, shortly after this telephone call,

> I walked in, came out of court and walked into his [the judge's] chambers, he told me that he was trying to get a hold of Commander Cunningham and that Commander Cunningham was ducking his call and wouldn't return his call and that, by God, he gave him ten minutes to be in his chambers and that five minutes had already gone by and that if he didn't show up he was going to have me arrest him, and I said, "God, judge, not another one."[1] . . . [H]e said, "You bet your a....., I'm gonna have his a....." . . . He said, Commander Cunningham better not f...... with him. First of all he said that he knows he's on duty 24 hours a damn day and they know how and where to get a hold of him so that he could talk to him and he said, "The Commander ain't gonna f...... with me . . ." He said, ". . . because . . ." he knew where all the g....d.... skeletons were and they better not f...... with him.

While we have felt impelled to delete portions of Judge Goldman's reported remarks, we feel constrained to observe that they reflected unrestrained anger and apparent purpose to injure the Commander.

Judge Goldman then telephoned attorney Christopher Byrd, who was in another judge's chamber at the time and whose law firm was representing KLAS-TV, Inc., telling Byrd to prepare an order for Goldman's signature requiring the release of the video

---

[1] The bailiff apparently was referring here to a series of incidents occurring that same week during which Judge Goldman had held other individuals in contempt of court, and ordered them jailed. These incidents included an 87-year-old woman who refused to testify against her son in a criminal matter, and a courthouse maintenance supervisor who had scheduled repairs on the roof of Judge Goldman's chamber at a time when Judge Goldman subsequently decided to hold court. The bailiff may also have been referring to numerous other incidents that have occurred over the years, in which Judge Goldman has inappropriately jailed or threatened to jail various county employees without cause. *See, e.g.,* Bowman v. District Court, 102 Nev. 474, 728 P.2d 433 (1986); Clark Cty. Dist. Atty. v. District Court, 101 Nev. 843, 710 P.2d 1384 (1985). The records of the County Clerk's office, of which we may take judicial notice, *see* Cannon v. Taylor, 88 Nev. 89, 493 P.2d 1313 (1972), indicate that at least twenty times in the last nine years, Judge Goldman has undertaken to hold in contempt of court personnel in the Clerk's office who he believed had transgressed his authority.

tapes. Apparently, attorney Byrd had consulted the other judge late in the afternoon on October 8, 1986, upon finding that Judge Goldman was presiding over a trial and was not immediately available. Byrd advised the other judge that his firm was representing KLAS-TV and one of the photographers who had videotaped Harms' fall, that he wanted a court order requiring the release of the tapes, and that Judge Goldman was also involved in the matter. The other judge spoke with Judge Goldman, who informed him that he had attempted to contact Commander Cunningham, but that Commander Cunningham was "ducking" him. In the presence of attorney Byrd, the other judge then agreed with Judge Goldman that either he or Goldman would sign an order requiring the release of the tapes, whoever was available when it was ready.

At 4:45 p.m., Judge Goldman was called back into a jury trial. Consequently, at approximately 6:15 p.m. that evening, the other judge signed an order requiring the release of the video tapes to KLAS-TV, Inc., for purposes of copying. At approximately 7:30 p.m. that evening, representatives of KLAS-TV, Inc., presented the order to the desk officer at the police station. No formal action of any kind was pending either before Judge Goldman or before the other judge at the time this order was signed, or when the copy was presented to the desk officer. Moreover, the copy of the order left at the police department was not file stamped, nor did it have any case number, department number or docket number appearing on it. Therefore, this order, not having been properly entered, was ineffective for any purpose. *See* NRCP 58(c). Nevertheless, the police department complied with the order as expeditiously as possible. Because the evidence vault containing the video tapes had been locked for the night, the police department allowed the copies of the video tapes to be made the following morning.

On October 9, 1986, attorney Byrd purported to file, on behalf of KLAS-TV, Inc. and the photographer, a document in the district court entitled "Application for Access to Video-tape." The "Application" was designated case Number A251505, Docket Number H, and was rotationally assigned to Department V, over which the Honorable John F. Mendoza presides. Byrd thereupon caused the order signed the previous evening, which required the release of the video tapes, to be filed and designated with the new case number, even though Judge Mendoza had done nothing in regard to its formulation. Thus, the incorrect appearance was created that the fugitive order actually signed on October 8 was responsive to, and executed after, the "application" filed on October 9.

In passing, it should be noted that we know of no legal

authority which would permit a person asserting an interest in personal property to obtain recovery of that property through such a motion or "application." NRCP 2 and 3 provide that there is but one form of civil action which is commenced by the filing of a complaint with the court. *See also* NRCP 7 (pleadings allowed in a civil action); NRS 31.840, et seq. (setting forth procedures for claims and delivery *in actions* to recover possession of personal property). In any case, although no civil action whatever involving the video tapes was presently pending before his department, Judge Goldman then proceeded to issue an order on October 9, 1986, to Commander Cunningham, requiring him to appear in Department X (Goldman's court) the following day at 9:00 a.m., and show cause why he should not be "adjudged guilty of civil contempt for failure to obey this court's [Judge Goldman's] order of October 8, 1986, to appear in chambers." Judge Goldman's order stated that he had ordered "[Commander] Cunningham to appear in the Chambers of Department X of the District Court . . . on Wednesday, October 8, 1986, to respond to inquiries concerning a videotape in the possession of the Las Vegas Metropolitan Police Department," and that the Commander had "failed to appear as ordered." Judge Goldman designated his order as in "case Number A251505, Department V," which is Judge Mendoza's court, and caused it to be so filed.[2]

The next morning, on October 10, 1986, Commander Cunningham appeared at the show cause hearing before Judge Goldman, represented by Deputy District Attorney Charles Hauser. The following exchange occurred:

> THE COURT: For purposes of the record, this Court ordered Mr. Byrd to prepare an Order to Show Cause to be served on Commander Cunningham for his failure to appear to this Court's order of the other day, and, Mr. Cunningham, is there anything you wish to say, sir?
>
> COMMANDER CUNNINGHAM: My position is I did not recognize your phone call which was relayed to me as one who was irrational, rude and would not wait for feedback as to phone numbers and as to really who you were. That is not something that I recognize as a lawful order of any Court.
>
> THE COURT: All right sir . . . I find you in direct contempt and put you in jail right now for 48 hours or until further order of the Court, whichever occurs last.
>
> COMMANDER CUNNINGHAM: Do I have a --
>
> MR. HAUSER: For the record, could we ask that this

---

[2]Commander Cunningham was not served with Judge Goldman's order until 2:00 p.m. on October 9, 1986.

be transferred to a neutral judge to have a hearing on the matter?

THE COURT: That objection is not timely, Counsel. He is remanded to custody forthwith.

MR. HAUSER: For the record also, your Honor, we believe there was no direct order because there was no case in front of the Court. So, there is no contempt.

Pursuant to Judge Goldman's purported order, the bailiff arrested and handcuffed Commander Cunningham, confiscated his weapon, and led him to the jury box where he was required to sit with other prisoners for approximately thirty minutes while Judge Goldman completed his calendar. Thereafter, Commander Cunningham was transported to the Clark County Detention Facility where he was photographed, fingerprinted and booked. The booking slip delivered to the jail with Commander Cunningham conveyed Judge Goldman's directive: "No bail, no writs."

Immediately thereafter, the District Attorney's office petitioned this court for extraordinary relief, challenging Judge Goldman's order. Unfortunately, Commander Cunningham was held in custody for about five hours, at which time he was released pursuant to an order of this court staying Judge Goldman's order of contempt. This court ordered an answer to the petition from respondent Judge Goldman, and the time for opposing the petition expired on November 12, 1986. Judge Goldman has not responded to the petition, and no answer has ever been filed on his behalf. Thus, the matter is ripe for this court's disposition.

Commander Cunningham contends that Judge Goldman acted without jurisdiction in entering the contempt order; that there was never any civil or criminal action pending before Judge Goldman upon which to issue a contempt order pursuant to NRS 22.010; that he could not be held in contempt for an act which was not clearly proscribed; and that, in any case, he did not act contemptuously. Commander Cunningham argues that, therefore, Judge Goldman's order punishing him for contempt is void. We agree.

NRS 22.010 and NRS 199.340 list the acts or omissions which constitute contempt.[3] *See* Bowman v. District Court, 102 Nev.

---

[3]NRS 22.010 provides:

The following acts or omissions shall be deemed contempts:

1. Disorderly, contemptuous or insolent behavior toward the judge while he is holding court, or engaged in his judicial duties at chambers, or toward masters or arbitrators while sitting on a reference or arbitration, or other judicial proceeding.

2. A breach of the peace, boisterous conduct or violent disturbance in the presence of the court, or in its immediate vicinity, tending to interrupt the due course of the trial or other judicial proceeding.

3. Disobedience or resistance to any lawful writ, order, rule or process issued by the court or judge at chambers.

474, 728 P.2d 433 (1986) (reversing Judge Goldman's order holding the clerk of the court in contempt). *See also* Clark Cty. Dist. Atty. v. District Court, 101 Nev. 843, 710 P.2d 1384 (1985) (reversing Judge Goldman's order holding the Office of Clark County District Attorney in direct contempt of court and imposing a fine). Commander Cunningham's actions did not fall within any of the acts or omissions enumerated in NRS 22.010 or NRS 199.340. Cunningham was not disorderly, contemptuous or insolent. No breach of the peace, boisterous conduct or violent disturbance took place. Cunningham did not abuse the processes or proceedings of the court, nor was there a showing that he deliberately or recklessly disregarded his duties with respect to the court. Further, Cunningham did not disobey or resist any lawful writ, order, rule or process issued by the court. As Cunningham noted in his comments at the show cause hearing, the district court did not issue any lawful order to Cunningham to appear at the courthouse on October 8, 1986.

An order on which a judgment of contempt is based must be

---

4. Disobedience of a subpoena duly served, or refusing to be sworn or answer as a witness.

5. Rescuing any person or property in the custody of an officer by virtue of an order or process of such court or judge at chambers.

6. Disobedience of the order or direction of the court made pending the trial of an action, in speaking to or in the presence of a juror concerning an action in which the juror has been impaneled to determine, or in any manner approaching or interfering with such juror with the intent to influence his verdict.

7. Abusing the process or proceedings of the court or falsely pretending to act under the authority of an order or process of the court.

NRS 199.340 provides:

Every person who shall commit a contempt of court of any one of the following kinds shall be guilty of a misdemeanor:

1. Disorderly, contemptuous or insolent behavior committed during the sitting of the court, in its immediate view and presence, and directly tending to interrupt its proceedings or to impair the respect due to its authority;

2. Behavior of like character in the presence of a referee, while actually engaged in a trial or hearing pursuant to an order of the court, or in the presence of a jury while actually sitting in the trial of a cause or upon an inquest or other proceeding authorized by law;

3. Breach of the peace, noise or other disturbance directly tending to interrupt the proceedings of a court, jury or referee;

4. Willful disobedience to the lawful process or mandate of a court;

5. Resistance, willfully offered, to its lawful process or mandate.

6. Contumacious and unlawful refusal to be sworn as a witness or, after being sworn, to answer any legal and proper interrogatory;

7. Publication of a false or grossly inaccurate report of its proceedings; or

8. Assuming to be an attorney or officer of a court or acting as such without authority.

clear and unambiguous, and must spell out the details of compliance in clear, specific and unambiguous terms so that the person will readily know exactly what duties or obligations are imposed on him. *See* Southwest Gas Corp. v. Flintkote Co., 99 Nev. 127, 659 P.2d 861 (1983). Judge Goldman's reported tirade to Commander Cunningham's secretary, described by her as being very rude, cannot be deemed an unambiguous order to Commander Cunningham, the terms of which should have been clear to and binding upon the Commander. Thus, even if some proceeding concerning the video tapes had then been pending, it is apparent that by not coming to Judge Goldman's chamber on October 8, Commander Cunningham would in no way have committed a contemptuous act, and Judge Goldman's subsequent order of commitment would have been arbitrary, capricious, and an abuse of process and judicial authority.

More importantly, it is apparent that Judge Goldman acted in excess of his jurisdiction not only when he "ordered" Commander Cunningham to appear in his chamber within ten minutes, but later when he issued the show cause order, and when he held Commander Cunningham in contempt of court. No civil or criminal action was pending before Judge Goldman during this time upon which such orders might lawfully issue. A district judge has no authority, inherent or otherwise, to issue an order to anyone to appear before him except as expressly provided by law. Because no criminal or civil action involving the right to possess the video tapes was pending before Judge Goldman, he lacked subject matter jurisdiction over the underlying dispute. Furthermore, because nothing remotely resembling a proper order had been issued and served upon Cunningham, in regard to any proper proceeding, Judge Goldman had no personal jurisdiction whatever over Cunningham. Even if the necessary action had been properly before Judge Goldman, a district judge lacks jurisdiction to order anyone to appear without cause and without reasonable notice, or outside the ordinary process of the court. Such orders, entered without jurisdiction, constitute an abuse of judicial power.

A writ of prohibition will lie to prevent a district court from exceeding its jurisdiction. *See* NRS 34.320; Goicoechea v. District Court, 96 Nev. 287, 607 P.2d 1140 (1980). In this case, Judge Goldman not only exceeded, but acted without any jurisdiction whatever. Accordingly, we grant Commander Cunningham's petition for a writ of prohibition. The order of the district court holding Commander Cunningham in contempt is

vacated as void, and the district court is prohibited from taking any further action based on that order, based on Judge Goldman's alleged oral order to appear, or based on Judge Goldman's order to show cause.[4]

Finally, we would be remiss if we did not notice that, following his unlawful incarceration of Commander Cunningham, Judge Goldman reportedly exacerbated the injury done to the Commander by proclaiming to news media that his own actions were justified and that he would therefore never apologize. Of course, public comment by a judge concerning pending or impending litigation is prohibited. *See* Nev. Code of Judicial Conduct Canon 3A(6). In view of Judge Goldman's public comments, we feel constrained to apologize to Commander Cunningham on his behalf.

[4]Because Christopher Byrd of the firm of Morse and Mowbray represented KLAS-TV below, the Honorable John Mowbray, Chief Justice, voluntarily disqualified himself from consideration or disposition of this petition.