THE HONORABLE PAUL S. GOLDMAN, DISTRICT JUDGE, EIGHTH JUDICIAL DISTRICT COURT, IN AND FOR THE COUNTY OF CLARK, STATE OF NEVADA, BY AND THROUGH JULIE GOLDMAN–WILSON, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF PAUL S. GOLDMAN, APPELLANT, *v.* THE NEVADA COMMISSION ON JUDICIAL DISCIPLINE, RESPONDENT.

No. 18326

April 1, 1992                                          830 P.2d 107

---

[4]The Honorable Jack B. Ames, Judge of the Fourth Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE THOMAS L. STEFFEN, Justice. Nev. Const. art. 6, § 4.

*Beckley, Singleton, DeLanoy, Jemison* and *List,* and *J. Mitchell Cobeaga* and *Alan J. Lefebvre,* Las Vegas; *Frank J. Cremen,* Las Vegas, for Appellant.

*Eugene J. Wait, Jr., Wayne A. Shaffer,* and *Jeffrey Dickerson,* Reno, for Respondent.

254

## OPINION

*Per Curiam:*

Former District Judge Paul S. Goldman appeals from the final report, findings of fact, conclusions of law and judgment of the Nevada Commission on Judicial Discipline (the commission).

Following formal proceedings, the commission found that appellant: (1) had voluntarily abandoned and relinquished his office; (2) had engaged in willful misconduct and habitual intemperance, unexcused by any claimed physical or mental disability; and (3) was not and had not been permanently disabled physically or mentally to perform the duties of his office in the sense contemplated by the Nevada Constitution and statutes. *See* Nev. Const. art. 6, § 21; NRS 3.092. Accordingly, the commission declared appellant's office vacant, ordered his removal from office, and rejected appellant's claim for an early, enhanced disability pension. Further, the commission directed that, at such time as appellant became eligible to receive retirement benefits, he would be entitled to only such standard, ordinary retirement benefits as he had earned during the course of his actual and active judicial service. For the reasons and with the modifications specified below, we affirm the commission's determinations.

## I. *PRELIMINARY COMMENTS*

On September 14, 1991, after this appeal was submitted for decision, appellant died in a tragic traffic accident. The special prosecutor for the commission, attorney Eugene Wait, Jr., subsequently filed a formal suggestion of death on the record. Thereafter, on October 24, 1991, appellant's counsel moved this court to substitute Julie Goldman-Wilson, the special administratrix of appellant's estate, as appellant's personal representative on appeal. *See* NRAP 43(a) (where a party dies during pendency of an appeal, any party may suggest the death on the record and the personal representative of the deceased party may be substituted as a party).

Although the right of this court to proceed to determination of the appeal under these circumstances is not in question, *see* Walker v. Burkham, 68 Nev. 250, 252, 229 P.2d 158, 159 (1951), we have nevertheless carefully considered whether appellant's death has rendered the issues presented moot. For the reasons stated below, we have concluded that the issues of first impression revealed on this record "are of such importance to the citizens of this State that an appellate resolution is virtually compelled." *See* McKay v. Bergstedt, 106 Nev. 808, 811-12, 801 P.2d 617, 620 (1990).

First, in our view, the responsible administration of the judicial disability retirement system warrants definitive, final appellate review of the commission's determinations respecting appellant's claim for an early, enhanced disability pension. *See, e.g.,* Judicial Inquiry and Review Bd. v. Snyder, 523 A.2d 294, 300 n.2 (Pa.) (Nix, C.J., concurring), *cert. denied,* 484 U.S. 829 (1987).

In addition, we perceive a need to clarify the circumstances under which the statutory authority relating to disability retirement conferred upon the governor is preempted by the commission's constitutional authority to resolve questions of judicial misconduct and disability.

A second and equally compelling concern is the lack of direct precedent addressing matters of judicial misconduct to which members of this state's judiciary may turn for guidance. *See* In re Weeks, 658 P.2d 174, 176 (Ariz. 1983) (court reached merits of judicial discipline matter where resolution of issues would provide future guidance to judiciary). Notably, Nevadans have historically manifested a pronounced sensitivity to potential abuses of judicial power. Scholars of this state's constitutional process have suggested, for example, that this sensitivity—originating from early public dissatisfaction and criticism of the Nevada Territorial bench—explains the presence of no less than four separate provisions in our constitution allowing for the removal of state justices and judges during their terms of office.[1] Little or no instructive and guiding local precedent, however, defines, or interprets the procedures and grounds upon which removal from judicial office is warranted under these provisions.

For these reasons, we have concluded that the responsible course is to proceed with a definitive and comprehensive resolution of the issues presented on this record. We emphasize, however, that our decision is premised not upon a desire to append an ignoble epitaph to a life and legal career that included many marks of excellence and distinction.[2] Rather, we proceed upon the premise that our comprehensive and conclusive review of this appeal will establish needed precedent, enhancing the efficacy of Nevada's judicial disability retirement system, the competence of its judicial officers and public confidence in the commission to promote and maintain the integrity of the judiciary. *See Snyder,* 523 A.2d at 298-99 (judge's defeat in election during pendency of disciplinary matter before supreme court did not end court's responsibility to maintain integrity of judicial administration and to uphold public respect for the rule of law; court's jurisdiction

---

[1]*See* Eleanor Bushnell and Don W. Driggs, *The Nevada Constitution: Origin and Growth,* 21, 136-39 (6th ed. 1984). *See also* Nev. Const. art. 7, § 2 (removal by impeachment and trial); Nev. Const. art. 7, § 3 (legislative removal upon grounds which may or may not be sufficient for impeachment); Nev. Const. art. 2, § 9 (removal by recall election); Nev. Const. art. 6, § 21 (removal by commission on judicial discipline).

[2]We also wish to emphasize that no suggestion is made on this record of judicial corruption, fraudulent conduct, personal dishonesty, or alcoholic intemperance. As will be seen, the allegations of misconduct against appellant entailed "willful misconduct" encompassing the abuse of his power of contempt and improper public commentary on pending litigation.

over disciplinary matters is only at an end when it issues a final order). *See also* Matter of Yaccarino, 502 A.2d 3, 30-31 (N.J. 1985) (predominant interest is preservation of public confidence in judiciary). In light of the above, we grant the motion to substitute Ms. Goldman-Wilson as appellant's personal representative.

## II. *PROCEEDINGS BEFORE THE COMMISSION*

In early October 1986, a series of disturbing events focused widespread attention on appellant's courtroom. Specifically, during the week of October 8, 1986, appellant held three individuals in contempt of court and ordered them jailed. The individuals included an 87-year old woman who refused to testify against her son in a criminal matter; a courthouse maintenance supervisor who appellant determined was responsible for noisy repairs on the roof of appellant's courtroom; and a Las Vegas Police Commander who appellant unlawfully held in direct contempt of court under circumstances wherein appellant lacked both subject matter and personal jurisdiction to take such action. *See* Goldman v. Bryan, 106 Nev. 30, 787 P.2d 372 (1990); Cunningham v. District Court, 102 Nev. 551, 729 P.2d 1328 (1986).

Concerned that appellant's behavior might constitute an emergency requiring tentative administrative reapportionment of the public's judicial business, Supreme Court Justice THOMAS L. STEFFEN travelled to Las Vegas on behalf of this court to inquire further into these preliminary indications of appellant's unusual judicial conduct. Subsequently, on October 16, 1986, appellant directed a letter to the chief justice of this court, requesting the court to relieve him temporarily of his responsibility to act on any matters pending before him. In view of appellant's apparent acknowledgement that he was at least temporarily unfit for judicial service, the full court entered an "Administrative Order" on October 19, 1986, temporarily reapportioning the public's judicial business in the interest of the efficient and effective administration of justice. *See* Goldman v. Bryan, 106 Nev. at 32-33, 787 P.2d at 374; Goldman v. Bryan, 104 Nev. 644, 647 n.3, 764 P.2d 1296, 1297-98 (1988). The order temporarily precluded appellant from attempting to exercise judicial functions without the prior approval of the court and directed the Chief Judge of the Eighth Judicial District Court to reassign to other judges of that district any cases then assigned to appellant for trial or hearing "as [was] necessary to accommodate the interests of justice."[3] *Id.*, 104 Nev. at 647 n.3, 764 P.2d at 1297-98.

---

[3]Appellant never thereafter requested this court to rescind the administrative order and continued to collect his full salary, without performing any judicial functions, from October 19, 1986, until June 16, 1987, when the commission entered the decision that is the subject of this appeal.

Thereafter, the Nevada Commission on Judicial Discipline commenced an investigation into appellant's fitness for office. Following an initial investigation, the special prosecutor filed with the commission an informal complaint against appellant setting forth numerous allegations of misconduct in office. The commission then scheduled and conducted a hearing to determine if probable cause existed to believe that appellant had engaged in willful misconduct or habitual intemperance. *See* Interim Rule 1.2.[4] Appellant attended the hearing with counsel.

The special prosecutor presented evidence in the form of documentary exhibits, as well as the testimony of numerous witnesses. Although appellant's counsel cross-examined witnesses, the only evidence introduced on appellant's behalf was a letter that he had previously written to then Governor Richard Bryan. The letter notified the governor of appellant's intention to seek an early, enhanced disability pension and requested the governor to appoint three physicians to examine him in accordance with NRS 3.092(3) to determine if he was "permanently incapacitated for medical reasons to perform the duties" of his office.[5] The governor, however, subsequently declined to act in accordance with NRS 3.092(3) upon advice from the attorney general that proceedings were pending or impending against appellant before the commission. Appellant's unsuccessful attempt to compel the governor to act was the subject of this court's opinion in Goldman v. Bryan, 106 Nev. 30, 787 P.2d 372 (1990).

Following the hearing, the commission issued written findings, conclusions, and an order of formal complaint. The order advised

---

[4]On January 10, 1978, this court adopted the Revised Interim Procedural Rules of the Nevada Commission on Judicial Discipline (hereinafter cited as "Interim Rule ......"). Interim Rule 1.2 was formally included in those rules upon entry of an "Order Adopting Rule For Public Hearings By The Nevada Commission On Judicial Discipline," filed March 18, 1985. The Interim Rules governed the commission proceedings involving appellant. They were superceded and replaced, however, on April 29, 1988, when the current and more comprehensive administrative and procedural rules became effective. *See* Supreme Court Rules, Part VII, Administrative and Procedural Rules for the Nevada Commission on Judicial Discipline (hereinafter cited as "Comm. Rule ......"). Although the current rules were not in effect at the time of the proceedings against appellant and did not govern those proceedings, we refer to them from time to time when the policies they reflect are relevant to the issues under consideration.

[5]NRS 3.092(3) provides in material part:

Any judge . . . who desires to retire voluntarily must give notice in writing to the governor. The governor shall appoint three physicians licensed to practice medicine in the State of Nevada to examine the judge and report the results to the governor in writing. If a majority of the physicians is of the opinion that the judge is permanently incapacitated, physically or mentally, the governor shall approve the retirement. . . .

appellant that the commission had found probable cause to believe that appellant had "perpetrated inappropriate and unacceptable judicial conduct in at least three areas," and that such conduct violated the Nevada Code of Judicial Conduct, as well as Nev. Const. art. 6, § 21, proscribing willful misconduct and habitual intemperance.

First, the commission found:

> It appears [Judge] Goldman has abused his contempt power by holding or threatening to hold individuals in contempt of court under circumstances clearly not warranted by law. *See, e.g.,* Clark County District Attorney v. Dist. Ct., 101 Nev. 843, 710 P.2d 1384 (1985); Bowman v. District Court, 102 Nev. 474, 728 P.2d 443 (1986); Cunningham v. District Court, 102 Nev. 551, & 555 n.1, 729 P.2d 1328, & 1330 n.1 (1986); and numerous other contempt orders issued by [Judge] Goldman against Loretta Bowman, Clerk of the District Court, and Mr. Kennard, Supervisor, Clark County Department of Maintenance. The foregoing represents examples of a course of conduct brought before the commission.

Second, the commission found that it appeared that appellant had improperly initiated direct contacts with an individual, whom appellant knew to be represented by counsel, and had engaged in judicial misconduct in subsequent dealings with that counsel.[6]

Third, the commission found:

> It appears that [Judge] Goldman made prohibited public commentary to news media concerning pending or impending litigation. Specifically, [Judge Goldman] made improper public comments to news media during a television interview and to newspaper reporters concerning the contempt citation and jailing of Commander Cunningham. The Supreme Court of Nevada has held that these public comments violated Canon 3(A)(6) [of the Nevada Code of Judicial Conduct]. *See* Cunningham [v. District Court, 102 Nev. 551, 729 P.2d 1328 (1986)].

The commission observed that, although appellant's counsel cross-examined some witnesses at the probable cause hearing, he presented "nothing to controvert the evidence of inappropriate conduct adduced against him," and instead, "seem[ed] to tender the issue that his inappropriate and unacceptable conduct was the

---

[6]In its final decision of June 16, 1987, the commission specifically found that the evidence relating to this charge was inconclusive and declined to return a finding of misconduct. Consequently, we are not concerned with this allegation of misconduct on appeal. *See, e.g.,* Wenger v. Commission on Judicial Performance, 630 P.2d 954, 956 (Cal. 1981).

product of his physical or mental disability." Thus, the commission stated that appellant "evidently contends that he is entitled to immediate enhanced disability retirement benefits, rather than the standard retirement benefits provided by NRS 3.090." The commission therefore concluded:

> Judge Goldman has conceded that he is not fit for judicial office, and the evidence demonstrates this. The issue remains as to whether he should receive standard retirement benefits pursuant to NRS 3.090, or increased benefits based on permanent physical or mental disability pursuant to NRS 3.092.
>
> Unless [Judge] Goldman can establish to the satisfaction of the Commission that his actions are the product of mental or physical disabilities which render him so incompetent and incapacitated that his inappropriate conduct should be excused, he should be removed from offce on constitutional grounds and should receive the standard pension for past services already earned pursuant to NRS 3.090(2) and (3).

The commission authorized the special prosecutor to arrange for independent experts to evaluate appellant's mental and physical condition and advised appellant that evidence pertaining to the extent of the alleged physical or mental disabilities would be received at a subsequent formal hearing wherein the commission would resolve:

> [W]hether Judge Paul S. Goldman's termination of office shall be based on removal for willful misconduct and/or habitual intemperance with allowance of a standard earned pension, or whether [Judge] Goldman should be retired as permanently disabled with an enhanced disability pension immediately payable notwithstanding that he has not yet reached the standard retirement age of sixty years.

Appellant thereafter filed a verified answer, generally denying the allegations of judicial misconduct stated in the formal complaint. The answer also contained the following admissions:

> [Appellant] admits he has declared himself permanently incapacitated to perform the duties of his office; admits that he is in fact incapacitated to perform the duties of his office for medical reasons; and admits further that because of this incapacitation he should be retired from his office as District Judge, Eighth Judicial District Court, Department Ten . . . .

Additionally, the answer set forth "affirmative defenses." Appellant asserted that the commission neither possessed jurisdiction to determine the extent of his disability, nor to adjudicate his entitlement to an early, enhanced, permanent disability pen-

sion. By exercising jurisdiction over those issues, appellant argued, the commission had "usurped the authority and power vested by the Legislature in the office of the Governor . . . under NRS 3.092." Appellant's answer thus urged dismissal of all charges of misconduct contained in the commission's order of formal complaint and specifically requested that appellant "be permitted to retire from judicial office due to permanent incapacity" and "granted the retirement benefits due him . . . as set forth in NRS 3.092."

Prior to the formal hearing, appellant filed a "motion to amend findings, conclusions and order of formal complaint and further written answer." Appellant's motion challenged the factual bases of certain of the commission's findings of probable cause and moved to strike or amend portions of the commission's order of formal complaint. In response, the commission issued an order denying appellant's motion in all respects but nonetheless clarifying certain issues for appellant's benefit. Specifically, the commission clarified that "three distinct issues" were pending in the proceedings.

First, the commission noted that appellant had tendered his resignation and request for early retirement, had acknowledged that he was unable to perform the duties of his office and had formally submitted to the commission his offer to retire. Although the commission indicated that, under these circumstances, it would be justified in issuing at the formal hearing an order declaring appellant's office vacant, it also expressly noted that appellant would "remain subject to a subsequent order of the Commission declaring that he is removed from office, either pursuant to his request for early retirement, with the *appropriate* pension, or for willful misconduct or habitual intemperance . . . ."[7] (Original emphasis.)

Second, the commission indicated that, because it had jurisdiction over the "original disciplinary matter," it would also determine at the formal hearing "the related questions of whether [appellant] became permanently disabled in office, whether any alleged misconduct on his part is excused by such disability, and whether [appellant] is entitled to special, enhanced disability retirement benefits." The commission ruled that, because appellant had tendered a claim for a special retirement benefit, it was "incumbent on him to prove that he is entitled to such a benefit."

Third, the commission stated that charges of willful misconduct and habitual intemperance were also pending before the commission, and the mere fact that appellant had "tendered his resignation on grounds of mental or physical disability" did not

[7]The commission eventually found it appropriate to resolve in a single final decision all the matters at issue.

preclude the commission from adjudicating those charges. The order stressed, however, that the burden of proving by clear and convincing evidence any facts justifying ''removal'' remained with the special prosecutor and not with Judge Goldman. Finally, the commission stated that, contrary to the assertions contained in appellant's motion, the prior order of formal complaint was ''not a final adjudication of any issue pending before this Commission.''

At the subsequent formal hearing, the special prosecutor offered and the commission ultimately admitted documentary evidence, including exhibits that were previously offered and admitted at the probable cause hearing.[8] Additionally, the special prosecutor presented the testimony of two psychiatrists who had been retained on behalf of the commission to examine appellant prior to the formal hearing. Appellant was also called to testify as an adverse witness.

In his defense, appellant testified on his own behalf and presented the testimony of witnesses including a physician of internal medicine, a psychiatrist, and a clinical psychologist. The commission admitted into evidence extensive medical records and other exhibits submitted by appellant.

Following the hearing, the commission entered its final report, findings of fact, conclusions of law and judgment, resolving the three distinct issues that it had previously defined as pending before the commission adversely to appellant. This appeal followed.

### III.  STANDARDS OF PROOF AND REVIEW

This is an appeal of first impression in Nevada. Consequently, we deem it appropriate to set forth the standards of proof and appellate review that have guided our assessment of the facts and issues disclosed in this record. See generally Matter of Samford, 352 So.2d 1126, 1128-29 (Ala. 1977); Geiler v. Commission on Judicial Qualifications, 515 P.2d 1, 4 (Cal. 1973), cert. denied, 417 U.S. 932 (1974).

---

[8]At the formal hearing the commission deferred ruling on appellant's objections to the admission of the transcript of the probable cause hearing and the exhibits that had been admitted at the prior hearing. In its final judgment, the commission declined to admit or consider the transcript of the probable cause hearing because Commissioner Shipler had not been present to observe the demeanor of the witnesses. As we hereafter discuss, however, the commission did admit and consider exhibits offered into evidence by the special prosecutor relating to appellant's issuance of show cause orders, official court transcripts relevant thereto and Nevada Supreme Court decisions reversing appellant's contempt citations. Further, the commission admitted and considered exhibits offered by the special prosecutor relating to appellant's public comments concerning pending and impending litigation.

*Quantum of Proof*

The rules promulgated by this court for the conduct of commission investigations and hearings expressly provide that a finding of probable cause to proceed with a formal hearing must be premised upon a determination that, "in reasonable probability, the evidence apparently available for introduction at a later formal hearing could *clearly and convincingly* establish grounds for disciplinary action within the commission's jurisdiction." *See* Interim Rule 1.2 (emphasis added); *see also* Comm. Rule 15. The "clear and convincing" standard governs judicial disciplinary proceedings in a majority of jurisdictions.[9] By requiring a lesser degree of proof than the reasonable doubt standard, the standard acknowledges the non-criminal and non-punitive nature of judicial disciplinary proceedings. At the same time, however, it is deferential to the severity of the sanctions that the commission may impose by requiring a higher degree of proof than the "mere preponderance of the evidence" standard that governs most civil proceedings. *See* In re Diener, 304 A.2d 587 (Md. 1973), *cert. denied,* 415 U.S. 989 (1974).[10] Therefore, pursuant to the applicable Nevada rules and in light of the persuasive authorities from other jurisdictions, we conclude that factual findings of the commission constituting grounds for censure, removal or retirement of a judicial officer must be premised upon clear and convincing evidence.[11] We note that in the instant case,

[9]*See* ABA Joint Comm. on Professional Discipline of the Appellate Judges' Conference and the Standing Comm. on Professional Discipline, *Standards Relating to Judicial Discipline and Disability Retirement* §§ 5.13, 5.17, and Official Commentary at 39, 41 (1978). *See also* In Re Hanson, 532 P.2d 303, 308 (Alaska 1975); *Geiler,* 515 P.2d at 4; In Re Jones, 728 P.2d 311 (Colo. 1986); In Re Rome, 542 P.2d 676 (Kan. 1975); Judicial Performance Com'n v. Walker, 565 So.2d 1117 (Miss. 1990); In Re Jordan, 622 P.2d 297 (Or. 1981).

[10]As the court noted in *Diener,* judicial discipline proceedings "are neither civil nor criminal in nature; they are merely an inquiry into the conduct of a judicial officer the aim of which is the maintenance of the honor and dignity of the judiciary and the proper administration of justice rather than the punishment of the individual." *Id.* at 594.

[11]Notably, this court has previously stated that proof of accusations against a county official, in *statutory* proceedings concerning that official's *removal* from office, "should attain the dignity of exceeding a reasonable doubt." Jones v. District Court, 67 Nev., 404, 418, 219 P.2d 1055, 1062 (1950) (quoting Ex Parte Jones and Gregory, 41 Nev. 523, 173 P. 885, 888 (1918) (McCarran, C.J., concurring)). *Jones,* however, is clearly distinguishable from the instant case. For example, judicial discipline commission proceedings differ substantially from the summary statutory proceedings at issue in *Jones.* In fulfilling its constitutional duty to promulgate rules for the conduct of commission proceedings, *see* Nev. Const. art. 7, § 4, the supreme court

the commission correctly discerned that the clear and convincing evidence standard governed its proceedings.

### Burden of Proof

The commission rules now in effect specifically provide that the prosecuting officer has "the burden of proving, by clear and convincing legal evidence, the facts justifying discipline in conformity with averments of the formal statement of charges." *See* Comm. Rule 27.[12] A judge who is the subject of formal allegations of misconduct is therefore not required to present evidence in the judge's own defense. Nonetheless, persuasive authority suggests that a judge who is the subject of formal allegations of misconduct must assume the burden of proof with respect to affirmative defenses.[13]

As a general proposition, we agree that the burden is properly assigned to a respondent judge to come forward with evidence supporting asserted affirmative defenses. Further, a mere preponderance of evidence is sufficient to establish an affirmative defense. We note, however, that where the requisite probable cause has been found and misconduct or disability is thereafter alleged in a formal statement of charges, the commission's prosecuting officer must always retain the burden of establishing the elements essential to a finding of misconduct or permanent physical or mental disability by way of clear and convincing proof. *See generally* Kelso v. State, 95 Nev. 37, 588 P.2d 1035 (states may require a defendant to prove by a preponderance of evidence a defense that does not negate any element of the crime charged, but if the defense, by its nature, disproves a fact essential to the offense, the burden may not be shifted from the prosecution), *cert. denied*, 442 U.S. 921 (1979).

---

has afforded respondent judges far greater procedural protections and safeguards than were provided to the accused official involved in the *Jones* case. Thus, in commission proceedings, the clear and convincing evidence standard poses none of the concerns which influenced the court's reasoning in *Jones*.

[12]Although this specific rule was not in effect during the course of the proceedings involving appellant, it codifies the proper and applicable standard and burden of proof.

[13]*See* ABA Joint Comm. on Professional Discipline of the Appellate Judges' Conference and the Standing Comm. on Professional Discipline, *Standards Relating to Judicial Discipline and Disability Retirement* § 5.13; Official Commentary at 39 (1978)· (respondent judge has "the burden of proof with respect to affirmative defenses"). *See also* John J. Todd and M. L. Proctor, *Burden of Proof, Sanctions, and Confidentiality,* 54 Chi.—Kent L. Rev. 177, 179 n. 13 (1977) ("[t]he respondent judge still has the responsibility to introduce evidence supporting affirmative defenses, such as misconduct due to mental or physical disability at the time the act was committed").

Moreover, *any* commission finding entitling a judge to early retirement on an enhanced disability pension must be premised upon clear and convincing evidence demonstrating a "mental or physical disability which prevents the proper performance of [the respondent judge's] judicial duties and which is likely to be permanent in nature." Nev. Const. art. 6, § 21(6)(b). Entitlement to an early, enhanced, permanent disability retirement is a special benefit potentially obligating the State of Nevada to extended payments of substantially greater cost to the state than a standard unenhanced pension. As the commission rules now reflect, where a respondent judge's entitlement to such a special benefit is in issue, regardless of whether the issue is raised in a formal statement of charges or, as here, by the respondent judge as an "affirmative defense," the commission may not commit the state to such an enhanced expenditure unless clear and convincing evidence demonstrates a disabling mental or physical condition that will likely be permanent in nature.[14] *See generally* Ex Parte McFaddin, 175 S.E.2d 218 (S.C. 1970) (rejecting judge's petition seeking permanent disability retirement for failure to meet statutory requirement which the court interpreted to mandate presentation of clear and convincing evidence that alleged disability would continue throughout judge's lifetime regardless of medical and other treatment). In our view, the public's right to the fiscally responsible administration of the judicial retirement system demands no less. It should be clear, however, that where a respondent judge is seeking to avoid involuntary retirement, an affirmative defense raised by that judge concerning the judge's disabled status need be proved only by a preponderance of evidence.

*Standards of Review*

The relevant constitutional provision defining this court's jurisdictional role in an appeal challenging commission action specifies as follows:

A justice of the supreme court or a district judge may, in addition to the provision of article 7 for impeachment, be

---

[14]Comm. Rule 33 now provides in pertinent part:

[C]onduct or omissions allegedly showing disability must be such as to demonstrate clearly and convincingly to the mind of any reasonable person that the respondent has been performing official duties in a manner substantially inconsistent with any reasonable view of judicial process. All conduct or omissions relied upon must be alleged with particularity, and must show a substantial disability which is likely to be permanent.

censured, retired or removed by the commission on judicial discipline. A justice or judge may appeal from the action of the commission to the supreme court, which may reverse such action or take any alternative action provided in this subsection.

Nev. Const. art. 6, § 21(1). Absent the prosecution of an appeal to this court by an aggrieved judge, this provision unambiguously vests the commission with final authority to order the censure, removal or retirement of a judicial officer. A commission decision to censure, remove or retire is not merely advisory or recommendatory in nature; it is of independent force and effect absent perfection of an appeal to this court.

This broad constitutional authority distinguishes Nevada's commission from similar commissions in other jurisdictions. The California Commission on Judicial Performance, for example, is constitutionally empowered only to make "recommendations" concerning the imposition of disciplinary sanctions. *See* Cal. Const. art. 6, § 18(c). Formal approval or further action by the California Supreme Court is necessary before any disciplinary sanctions may be imposed. *Id.*

In declaring the standard of review to be applied under this "recommendation" system, the California Supreme Court has observed:

> Were a recommendation of independent force and effect absent further action by this court, our review of the evidentiary basis for that recommendation might properly be limited to a determination whether the Commission's findings of fact were supported by substantial evidence. Under such a standard of review we would not be free to disregard the Commission's findings merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact.

*Geiler,* 515 P.2d at 4. In *Geiler,* however, the court further noted that the California Constitution expressly entrusts that state's high court with the sole responsibility and authority to render "the ultimate, dispositive decision to censure or remove . . . ." *Id.* In exercising that authority, the California court independently evaluates the record evidence and renders its own findings of fact and conclusions of law. Judicial disciplinary procedures in many other jurisdictions are patterned after California's pioneering judicial disciplinary procedures and similarly require review and final approval of commission recommendations by a higher tribunal.[15]

---

[15]*See* In re Inquiry Concerning a Judge, 762 P.2d 1292, 1294 (Alaska 1988); In re Kelly, 238 So.2d 565, 571 (Fla. 1970), *cert. denied,* 401 U.S.

Thus, the express authority vested in this court under article 6, section 21 of the Nevada Constitution contrasts sharply with the ultimate and dispositive constitutional authority conferred upon courts of review in these "recommendation" jurisdictions. It is readily apparent that by deviating from the California model, the drafters of article 6, section 21 of the Nevada Constitution rejected California's "recommendation" system in favor of procedures intended to vest a far greater degree of authority in Nevada's commission.[16] *See, e.g.,* Matter of Samford, 352 So.2d 1126, 1129 (Ala. 1978) (where adoption of constitutional amendment replaced old "recommendation" system of judicial discipline with new system merely authorizing appeal, Alabama court's scope of review was restricted by such amendment to a determination of "whether the record shows clear and convincing evidence to support the order of the Court of the Judiciary").

We conclude, therefore, that the Nevada Constitution does not contemplate this court's *de novo* or independent review of factual determinations of the commission on appeal. To the contrary, the constitution confines the scope of appellate review of the commission's factual findings to a determination of whether the evidence in the record as a whole provides clear and convincing support for the commission's findings. The commission's factual findings may not be disregarded on appeal merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact. *See Samford,* 352 So.2d at 1129; *cf. Geiler,* 515 P.2d at 4.

This court, of course, is not bound by the commission's conclusions of law. *Cf.* In re *Jones,* 728 P.2d 311, 313 (Colo. 1986). Moreover, where an appeal from the commission's order of censure, removal or retirement is taken, this court is expressly empowered to "reverse such action or take any alternative action provided in this subsection." Nev. Const. art. 6, § 21(1). Thus,

---

962 (1971); Matter of Del Rio, 256 N.W.2d 727, 735 (Mich. 1977), *appeal dismissed,* 434 U.S. 1029 (1978); Matter of Field, 576 P.2d 348 (Or. 1978). *See also* American Judicature Society, *Judicial Conduct Organizations, Governing Provisions* (Kathleen Sampson and Joseph A. Cahill 1984) (detailing constitutional and statutory provisions of various jurisdictions); Shaman, Lubet and Alfini, *Judicial Conduct and Ethics,* § 13.01 at 381 (1990).

[16]Notably, such an intent is also evidence by the care taken by the drafters to insure fairness, competence, non-partisanship and geographic diversity in the commission's makeup. The commission, for example, must be composed of two justices or judges appointed by the supreme court, two attorneys appointed by the state bar, and three lay members appointed by the Governor. *See* Nev. Const. art 6, § 21(2). Moreover, an appointing authority may not appoint more than one resident of any county, nor more than two members of the same political party. *See* Nev. Const. art 6, § 21(4).

on appeal, we are specifically enjoined by the constitution to exercise our independent judgment regarding the appropriate sanction warranted by factual findings properly adduced by the commission. As the Alaska Supreme Court has observed, albeit under a recommendatory system:

> It would be tantamount to an abdication of our constitutional and statutory obligations if we were to automatically adopt the commission's sanction recommendation. In every case of this character we must insure that procedural due process has been accorded the judicial officer proceeded against and that requisite findings of fact have been made and are supported by substantial evidence. We are further obligated to decide whether the recommended sanction is justified by the record and is in accord with the objectives of the commission as reflected in the relevant constitutional and statutory provisions.

*See* In re Inquiry Concerning a Judge, 762 P.2d 1292, 1294 (Alaska 1988). With these standards in mind, we turn to a review of the commission's specific findings and conclusions.

## IV. *THE CLAIM OF PERMANENT DISABILITY*[17]

During the formal hearing, the special prosecutor presented the expert testimony of Dr. William Thornton and Dr. Lynn B. Gerow, both licensed psychiatric physicians retained on behalf of the commission to examine appellant. Dr. Thornton testified that, in his opinion, appellant was suffering from a disability that "is a direct result of his being depressed." Dr. Thornton, however, did not consider that disability to be "by any means permanent." Assuming appropriate treatment with anti-depressant medications and "some psychotherapy," Dr. Thornton's prognosis for appellant's chances of functioning in a law-related capacity was "excellent." Dr. Gerow similarly testified that appellant was not permanently mentally incapacitated. Rather, Dr. Gerow stated,

---

[17]We note that appellant has not raised in this appeal any specific assignments of error contesting the commission's determinations rejecting his claim to an early, enhanced disability pension. The general, prevailing rule in appellate proceedings is that prejudicial error is never presumed and must be made to affirmatively appear. *See* Holland Livestock v. B & C Enterprises, 92 Nev. 473, 553 P.2d 950 (1976). Generally, appellate affirmance of a lower tribunal's judgement is warranted where such error is neither alleged, demonstrated, nor is plainly apparent on the face of the record. *See* Sievers v. County Treas., Douglas Co., 96 Nev. 819, 618 P.2d 1221 (1980). Although this court's summary affirmance of the commission's determinations respecting appellant's claim to an early disability retirement might well be warranted on this basis alone, we have nonetheless thoroughly reviewed the commission's determinations respecting appellant's claim of permanent disability and, as discussed below, our detailed review of the record reveals no prejudicial error whatsoever.

appellant was suffering from a type of depression that was a "temporary impairment." With a leave of absence and systematic therapy, Dr. Gerow opined, appellant "could return to whatever legal pursuits he wished."

Appellant presented the testimony of Dr. Lance Mayor (a physician of internal medicine), Dr. Juan Carlos Laborati (a physician and psychiatrist), and Dr. Joan Owen (a clinical psychologist). Dr. Mayor had previously treated appellant for high blood pressure. He conceded that he would have to defer to a psychiatric physician respecting appellant's mental fitness for the bench. Because of the stress associated with being a judge, however, he had encouraged appellant to consider leaving the bench. Moreover, Dr. Mayor stated that in his view appellant was to a reasonable medical certainty permanently disabled from being a judge.

Based on visits with appellant between December 1985 and May 1986, Dr. Laborati diagnosed appellant as afflicted with "major reactive depression" aggravated by pre-existing back problems and hypertension that "complicated the presence of the depression." In his opinion, appellant was permanently incapacitated from performing the functions of a judge. Dr. Laborati testified that it was "possible," but not "probable," that appellant could return to the bench. If appellant was still his patient, the doctor stated, he would advise against appellant's return to judicial duties because exposure to continuous stress could have a deleterious effect on appellant's depression. Dr. Laborati further indicated, however, that appellant was not mentally incapacitated from *any* kind of productive work. In Dr. Laborati's view, appellant could do anything *but* be a judge.

Dr. Owen, a clinical psychologist, testified that she had seen appellant professionally approximately twenty-five or thirty times since April of 1987. Her treatment focused on "issues of stress, career options, family issues." Over the special prosecutor's objection that Dr. Owen was not qualified to render an expert medical diagnosis of appellant's mental or physical condition, the commission permitted her to state her opinion as a therapeutic counselor that appellant was afflicted with major depression and that he was permanently incapacitated from returning to the bench.

Additional evidence before the commission relating to the alleged permanent nature of appellant's claimed disability consisted of exhibits submitted by appellant detailing his medical history. The medical records indicated that appellant had been hospitalized numerous times since 1982 with various complaints, including lower back pain, giant hives, ulcers, hypertension, headaches, fainting spells and episodes of visual blurring and weakness in his limbs. On one such occasion in December of

1985, appellant was admitted to a hospital emergency room after his secretary found him on the floor of his chambers in an "altered state of consciousness." He was subsequently diagnosed as suffering from depression, placed on medication and discharged in stable health. He was again admitted briefly to the hospital in February 1986 after a fainting spell and was discharged with instructions to relax and get some rest. On another occasion in April 1986, appellant was hospitalized and diagnosed as suffering from probable depression and anxiety. Following treatment with medication, he improved rapidly and was discharged feeling "much better." On October 17, 1986, appellant again sought treatment in a medical facility in Orange, California. The records indicate that appellant was diagnosed as suffering from a "very real bipolar disorder" which would require "longstanding psychiatric support." The records further indicate that, although appellant was discharged in fair condition, his "mental status at the time of discharge was still one of a person given to rapid cycling mood swings but he was cooperative and comfortable."

The commission returned the following findings respecting the permanency of appellant's alleged disability:

1. Although [Judge Goldman] claims to be permanently disabled to perform the duties of his office, this claim is contradicted by responsible medical testimony indicating that, at most, [Judge Goldman] is suffering from a condition of depression and stress which with proper treatment should only be temporary. The Commission credits and accepts this testimony. The Commission further rejects as unpersuasive any ostensibly contrary testimony of [Judge Goldman's] expert witnesses.

2. In light of the foregoing, the Commission finds that [Judge Goldman] has failed to establish any claim for a disability pension, because even assuming, arguendo, he is or has been disabled, [Judge Goldman] has failed to establish that such disability is likely to be permanent in nature.

3. To the contrary, the Commission affirmatively finds that [Judge Goldman] is not, and has not been, physically or mentally disabled to perform the duties of his office, in the sense contemplated by the Nevada Constitution and statutes.[18]

---

[18]*See* Nev. Const. art. 6, § 21(6)(b) (commission may retire a judge only where advanced age interferes with the proper performance of the judge's duties or where a mental or physical disability prevents the proper performance of judicial duties and is likely to be permanent in nature); NRS 3.092 (a judge is entitled to early enhanced disability pension only when he is "permanently incapacitated, physically or mentally . . .").

4.  The Commission concludes, as a matter of law, that even if [Judge Goldman] had been suffering from a disability at the time of some of the aforementioned misconduct, any such disability would not justify the Commission in awarding him an enhanced pension for such disability, because it does not appear that any such disability was, or is likely to be, permanent in nature. Nev. Const. art. 6, § 21(6)(b).

Our review of the record reveals clear and convincing evidentiary support for the commission's findings. As noted, Drs. Thornton and Gerow both testified that appellant's depression was in the nature of a temporary impairment which was by no means permanent. Dr. Gerow's testimony specifically refuted the evidence contained in the medical records indicating that appellant may have suffered from a long-term "bipolar disorder."[19] The testimony of Dr. Gerow and Dr. Thornton provided a clear and convincing factual basis for finding that, with medication and systematic treatment, appellant could function as a judge and that, therefore, appellant's alleged disability was *not* likely to be permanent in nature.

Even discounting that expert testimony, however, the record provides substantial support for the commission's finding that appellant failed in his burden to demonstrate that he was permanently disabled from performing the duties of his office in the sense contemplated by the Nevada Constitution and statutes. Although evidence in the record indicates that appellant suffered from intermittent bouts of depression and stress-related ailments, other testimony and evidence was adduced at the hearing establishing that appellant's condition stabilized or rapidly improved on the occasions when he received a systematic course of prescribed and supervised treatment. Such treatment enabled him to remain quite functional. It was also established during the hearing, for example, that in the early 1980's appellant was able to preside over some of the most complex litigation ever to come before the Eighth Judicial District Court. Moreover, the only testimony presented by appellant from an expert qualified to render a medical *and* psychiatric opinion was at best ambiguous. In our view, the record as a whole provides a sound basis to discount Dr. Laborati's testimony that appellant could do *any-*

---

[19]Specifically, Dr. Gerow observed that the doctor responsible for that diagnosis of bipolar disorder provided no basis for the diagnosis, described no manic behavior, mentioned no previous manic episodes in his discharge summary or his history and, thus, laid no foundation for that diagnosis. Further, in rejecting the diagnosis of bipolar disorder, Dr. Gerow noted that "Judge Goldman said he had not had any previous manic episode when I examined him."

*thing but* be a judge. *See* Ex Parte McFaddin, 175 S.E.2d 218 (S.C. 1970).

Additionally, we note that the applicable constitutional and statutory provisions do not establish procedures allowing for periodic or future review of a claimant's disability status once an early, enhanced judicial disability pension has been awarded. The absence of any such provisions persuades us that an early judicial disability pension may be awarded only where clear and convincing evidence establishes that a judge is truly *in extremis* and that, even with medical treatment, the judge will not be likely to recover his health and capacity to perform the duties of his office.[20] *Compare* Ex Parte McFaddin, 175 S.E.2d 218, 219-20 (S.C. 1970) (judge's petition for permanent disability retirement denied where medical reports failed to show that medical treatment was not available to provide relief from emotional discomforts and other conditions) *with* State Ex Rel. Simms v. Simmons, 711 P.2d 949, 952 (Okl.Jud.App.Div. 1985) (retirement compensation awarded where seventy-year old judge demonstrated erratic, bizarre behavior and erosion of judicial ability and temperament following surgery and radiation therapy for progressive and worsening cancer and other physical maladies). In our view, on the basis of the evidence disclosed in this record, any contrary findings by the commission authorizing appellant's retirement on an early, enhanced disability pension would have manifestly expanded the constitutional and statutory intendment of the disability provisions far beyond that which was envisioned by the legislature or the electorate.

---

[20]We further note that on October 1, 1990, shortly before the oral argument in this appeal, the special prosecutor moved this court to dismiss as moot any issues pertaining to appellant's alleged entitlement to permanent disability status. The special prosecutor requested this court to take judicial notice of official records demonstrating that appellant had in fact eventually returned to work as an assistant district attorney in Nye County, Nevada, and that, in a subsequent election bid for the Office of Nye County District Attorney, appellant held himself out as fully qualified and capable of serving in that position. We have concluded, however, that our review is properly confined to the record made and considered by the commission. Thus, in reviewing the propriety of the commission's factual and legal determinations respecting appellant's physical and mental status, we have not considered appellant's subsequent return to work as an assistant prosecutor or his bid for election to demanding public office. Accordingly, we deny the special prosecutor's motions of October 1, 1990. Nonetheless, we note that the matters raised in the motions support our conclusion that the constitutional and statutory provisions relating to judicial disability retirement should be strictly construed to apply only where clear and convincing evidence demonstrates that a judge, who is truly *in extremis,* is unable to function in office and is unlikely to recover the capacity to function.

We note, as did the commission, that the record does contain ostensibly conflicting evidence. The commission, however, was entitled to rely on the expert testimony of Dr. Thornton and Dr. Gerow, and it was for the commission to determine the weight and credibility to give to any conflicting testimony or evidence. *See, e.g.,* Ogden v. State, 96 Nev. 697, 615 P.2d 251 (1980) (when there is conflicting psychiatric testimony at a competency hearing, the trier of fact resolves the conflicting testimony of the witnesses). As noted above, we are not free to disregard the factual determinations of the commission simply because the circumstances involved might also be reconciled with contrary findings of fact. Even assuming, without suggesting, that some evidence may have legitimately supported such contrary findings, we are obligated to uphold the factual findings of the commission unless they are unsupported by clear and convincing evidence in the record as a whole. The commission's findings are adequately supported by the evidence. Therefore, we affirm the commission's determinations that appellant was not entitled to an early, enhanced permanent disability pension, and that, instead, he was entitled only to such standard and ordinary retirement benefits as he had earned during the course of his actual and active judicial service. *See* Powers v. Bd. of Control of Jud. Ret. Fund, 434 So.2d 745 (Ala. 1983).

Appellant asserted the "affirmative defense" in the proceedings below that the commission lacked jurisdiction to resolve his alleged entitlement to an early, enhanced permanent disability retirement and that, therefore, the commission had "usurped the authority and power vested by the Legislature in the office of the Governor of the State of Nevada pursuant to NRS 3.092." In Goldman v. Bryan, 106 Nev. 30, 787 P.2d 372 (1990), we previously addressed the commission's jurisdiction in a somewhat different context.

*Bryan* entailed a challenge to an order of the district court denying appellant's petition for a writ of mandamus. The petition sought to compel the governor to act on appellant's request to retire under NRS 3.092(3). We held in *Bryan* that the commission derived its authority to determine appellant's entitlement to disability retirement directly from the constitution. *See* Nev. Const. art. 6, § 21(1), (6) and (7). Additionally, we affirmed the district court's conclusion that the applicable provisions of the constitution constitute the supreme law of the state and control over any conflicting statutory provisions. *See* Robison v. District Court, 73 Nev. 169, 313 P.2d 436 (1957) (provision in constitution respecting impeachment of state officer controls over conflicting legislative enactment providing statutory scheme for removal). Thus,

we held that the commission's constitutional jurisdiction to resolve appellant's claim to an early, enhanced disability pension prevailed over the authority conferred upon the governor under the provisions of NRS 3.092(3). *Bryan,* 106 Nev. at 37, 787 P.2d at 377.

Nevertheless, we also emphasized in *Bryan* that the commission had in fact *expressly* assumed jurisdiction over the issue of appellant's entitlement to an early, enhanced disability retirement prior to the time appellant filed his petition in the district court seeking to compel the governor to act in accordance with NRS 3.092(3). We concluded under those circumstances that the commission's "express assertion of its primary constitutional jurisdiction," prior to the date appellant petitioned the district court for a writ of mandamus "was completely dispositive of the issues presented by appellant's petition for extraordinary relief." *Id.* at 43, 787 P.2d at 381. Additionally, we stated that "although mandamus *may* have been available to compel the Governor to act in the absence of any pending Commission proceedings, once the Commission exercised its constitutional authority and jurisdiction, the remedy of mandamus was foreclosed and appellant could not utilize NRS 3.092(3) as a means of escaping the Commission's disciplinary authority." *Id.* at 38, 787 P.2d at 378 (emphasis added). We take this opportunity to clarify our precise holding in *Bryan* to stress that the commission's "express" assertion of its jurisdiction is not the sole, determinative factor precluding action by the governor pursuant to NRS 3.092(3).

Our holding in *Bryan* was never intended to imply that a judge may automatically defeat the commission's jurisdiction to commence proceedings relating to the alleged misconduct or disability of that judge by racing to the governor with a notice of intention to seek early, enhanced disability retirement in accordance with NRS 3.092(3). As we noted in *Bryan,* the commission's jurisdiction derives directly from the constitution. That constitutional authority can neither be precluded nor ousted by a judge's notice to the governor stating an intention to retire pursuant to NRS 3.092(3). *See generally* Quinn v. State Com'n on Judicial Conduct, 430 N.E.2d 879, 885 (N.Y. 1981) (judge charged with misconduct may not generally avoid consequences of removal for cause by racing to resign); Matter of Probert, 308 N.W.2d 773, 775-77 (Mich. 1981) (judge should not have the power, simply by leaving office, to short-circuit investigation of allegations against him); *see also* Powers v. Bd. of Control of Jud. Ret. Fund, 434 So.2d 745 (Ala. 1983); In re Peoples, 250 S.E.2d 890 (N.C. 1978), *cert. denied,* 442 U.S. 929 (1979).

Overriding considerations of public policy, as well as the underlying policy and purpose of discipline commission proceedings, demand a thorough and comprehensive investigation and

adjudication where mixed questions of misconduct and disability are potentially at issue. The commission, rather than the Office of the Governor, is the "proper entity exclusively empowered to act in the first instance, whenever issues of possible misconduct are presented along with issues of disability in a given case . . . ." *Bryan,* 106 at 41, 787 P.2d at 379.

An untenable and intolerable situation would arise, for example, if a judge who had committed misconduct in office could foreclose the commission's jurisdiction by invoking the provisions of NRS 3.092(3) and simply tendering to the governor a notice of intention to seek an early, enhanced disability retirement. The statute contemplates that the governor's authority to retire a judge may be invoked only where the matters in controversy are limited to the permanency and the extent of the judge's disability.

The commission, on the other hand, must and does have the constitutional authority to consider and balance the competing and conflicting social and public policy interests at issue where the matters in controversy include mixed questions of misconduct and disability. In evaluating whether to retire or remove, the commission, unlike the governor, may consider the policy concerns underlying NRS 3.092(3), *i.e.,* to encourage and permit a seriously disabled judge to step down from office with dignity and some protection from the specter of financial ruin. Further, the commission may take into account the equally compelling social and public policy against permitting an undeserving judge to retire with an early, enhanced pension and thus benefit from or avoid the consequences of misconduct. The commission possesses the authority to weigh and balance all the equities as well as the rights of the judge and the public's interest in the competence and ethical integrity of the bench. Thus, where, as here, allegations of judicial misconduct provide an incipient basis for commission action under the state constitution, overriding concerns of public and social policy, as well as the commission's preeminent constitutional authority to resolve all potential questions of misconduct and entitlement to early, enhanced disability retirement, must foreclose any attempt by a judge to compel the governor to act in accordance with NRS 3.092(3). The proceedings before the commission must be permitted to run their full constitutional course from their inception to their conclusion.

### V. *WILLFUL MISCONDUCT: ABUSES OF POWER OF CONTEMPT*

The commission found that appellant abused his power of contempt on eight separate occasions, thereby demonstrating a

long-standing pattern of willful misconduct warranting appellant's removal from office. The evidence admitted by the commission at the formal hearing relating to these incidents is summarized as follows.

## The Clark County District Attorney Incident

On February 27, 1985, appellant held the Office of the Clark County District Attorney in direct contempt of court because a deputy district attorney was unable to announce at a calendar call whether or not the state would be ready to try a criminal case on a date previously set for trial. The complete facts regarding this episode are detailed in a prior opinion of this court reversing the contempt citation issued by appellant. *See* Clark Cty. Dist. Atty. v. District Court, 101 Nev. 843, 710 P.2d 1384 (1985).[21] The commission admitted into evidence a certified copy of the opinion at the formal hearing. Other evidence admitted and considered by the commission included exemplified copies of appellant's order to show cause and his order of contempt. Additionally, appellant testified extensively regarding this incident at the formal hearing.

The evidence established that this court reversed appellant's contempt order because the actions of the deputy district attorney did not constitute a contemptuous act under either NRS 22.010 or NRS 199.340, and because "[t]here was no showing that anyone connected with the Clark County District Attorney's Office deliberately or recklessly disregarded their duties with respect to [Judge Goldman's] court. An oversight occurred, but it did not disrupt the court or prejudice the defendant." *Clark Cty. Dist. Atty.*, 101 Nev. at 845-46, 710 P.2d at 1386. Notwithstanding this court's holding, however, appellant insisted in his testimony before the commission that his order of contempt was entirely

---

[21]The facts as stated in that opinion reveal that at a calendar call in a criminal case, appellant inquired whether the parties would be ready to go to trial the following week, as previously scheduled. After the deputy district attorney in attendance indicated that he could not say whether the state was ready to proceed because he did not have the case file, appellant held the district attorney in direct contempt of court and assessed a fine against the district attorney of $250. Appellant issued the contempt citation notwithstanding defense counsel's request for a continuance. Additionally, appellant ordered the district attorney to appear before him to show cause why the case should not be dismissed. At that show cause hearing, a deputy district attorney attempted to explain that a clerk in the district attorney's office had inadvertently failed to send the case file over to the court at the previous calendar call, and consequently, the team deputy who appeared before the court at the prior calendar call was unable to answer the judge's questions. At the conclusion of the hearing, appellant quashed the order to show cause, but amended his contempt order, *sua sponte,* to indicate that the Office of the Clark County District Attorney, was being fined rather than the district attorney personally. *Id.* at 844-45, 710 P.2d at 1385.

appropriate and that his various actions entailing issuance of show cause orders and contempt citations in general had all been "quite correct." A portion of appellant's testimony respecting this specific incident is set forth in the margin.[22] Based upon this evidence and testimony, the commission found that appellant abused the contempt power vested in him as a judge.

## The Gordon Yach Incident

The evidence adduced at the formal hearing in this respect consists entirely of exemplified copies of an order to show cause issued by Judge Goldman, an affidavit of an attorney attached to that order and an acknowledgment of receipt of service of the order to show cause. These documents merely establish that, on June 20, 1986, appellant issued an order directing Gordon Yach, the Director of the Clark County Detention Center, to show cause why he should not be adjudged guilty of contempt of court and punished for his failure to immediately transport a prisoner to appellant's courtroom "when requested to do so on June 18, 1986 at 4:45 p.m." The order further provided that Mr. Yach's failure to appear at the scheduled show cause hearing would result in the issuance of a bench warrant for the arrest and confinement of Mr. Yach. An attorney's affidavit attached to the order indicates that a jury returned a verdict against a criminal defendant at 4:45 p.m. on June 18, 1986, and the Clark County Detention Center was immediately notified to bring the prisoner to appellant's courtroom. Repeated calls were thereafter placed to the Detention

---

[22]The transcript reflects that the following exchange occurred between the special prosecutor and appellant:

Q. [The Special Prosecutor] Okay. All right. Then the Supreme Court found that there was no contemptuous act as defined by the statute?

A. [Appellant] Are you asking me a question, sir?

Q. Question: Is it true that NRS Chapter 22 and NRS Chapter 199 list the acts or omissions which constitute contempt?

A. I'll have to take your word for it. I'm sure they do.

Q. So you can find things in contempt without knowing what the statute says about that?

A. Oh, yes, I think so.

Q. That's pretty easy to do?

A. Oh, yes, I think so.

Q. Okay. Which subsection of which chapter of NRS were you relying on when you found the District Attorney—

A. I don't know what section it's in, sir. I know it was interfering with the orderly process of the Court.

Q. Well, could you tell us why the Supreme Court couldn't find the subsection that you were using to find the office in contempt?

[Appellant's Counsel]: Objection.

[Appellant]: I challenge anybody to explain the rationale of the Supreme Court to me.

Center to ascertain the delay in the prisoner's presence, and the Detention Center did not deliver the prisoner until 5:20 p.m., a mere thirty-five minutes after the initial call. Although no further evidence respecting this incident was adduced at the formal hearing, the commission found that appellant abused the contempt power vested in him and that threatening to hold Mr. Yach in contempt "was inappropriate, and tended to degrade the judicial process."

### The First Loretta Bowman Incident

The order of contempt issued by appellant in this instance was reversed by this court in Bowman v. District Court, 102 Nev. 474, 728 P.2d 433 (1986). As that opinion relates, on September 17, 1985, appellant held Loretta Bowman, the Clerk of the Eighth Judicial District Court, in contempt of court, sentenced her to serve twenty days in the county jail, and imposed sanctions of $500. Appellant entered his order because a deputy court clerk had accepted and filed a motion to dismiss in a civil action on the day after a default had been entered in the same case. *Id.* at 476, 728 P.2d at 434.

In *Bowman,* this court concluded that neither the actions of the court clerk nor the actions of her deputy constituted a contemptuous act under NRS 22.010 or NRS 199.340. Rather, because the clerk and her deputies had a ministerial duty to accept and file documents and no authority to pass upon the validity of instruments presented for filing, this court concluded that appellant "held Ms. Bowman in contempt for conscientiously fulfilling her responsibilities as court clerk." *Id.* at 478, 728 P.2d at 435.

A certified copy of this court's opinion and exemplified copies of appellant's order to show cause and order of contempt were admitted by the commission into evidence at the formal hearing. Appellant also testified at the formal hearing respecting this incident.[23] Based upon this evidence and testimony, the commis-

---

[23]Specifically, appellant testified in part as follows:

    Q. [The Special Prosecutor:] [T]ell us about what contemptuous act you were relying on to find [Ms.] Bowman entitled to $500 fine and 20 days in jail? What was it that she did that required you to put her in jail for 20 days?

    A. [Appellant:] [Ms.] Bowman's incompetence was evident to me for the past 13 years. Therefore, this was but one act in a long course of conduct of incompetence.

    Q. Was it your understanding, then, that Loretta Bowman stamped this in—in this motion?

    A. No.

    Q. Well, then, what conduct on her part was contemptuous?

    A. I have been raised to believe that those who are in charge are responsible.

    Q. So the failure of Loretta Bowman to watch her deputy clerk

sion found that appellant abused the contempt power vested in
him as a judge.

## The Southern Nevada Memorial Hospital Incident

At the formal hearing, an exemplified copy of an order issued
by appellant on December 2, 1985, in a criminal case was
introduced into evidence. The order directed the City of North
Las Vegas to transport a criminal defendant to Southern Nevada
Memorial Hospital for a psychiatric examination. Additionally,

---

stamp in this motion and prevent it was the act of contempt that you
found justified 20 days in jail?

A. Yes. The judges of our district passed a generic rule addressed to
[Ms.] Bowman. She has violated—

Q. No, Judge, we're talking about your conduct, not the other
judges.

A. That's what I'm talking about. She didn't obey the Court's rule.
When I say the Court, I'm talking about the Eighth District.

Q. Yeah. You found her deserving of 20 days in jail?

A. Absolutely.

Q. Okay. And that was because her clerk stamped in something that
you didn't want in the Court?

A. In part.

Q. And that's contemptuous?

A. In part.

Q. So you would just do that again the next time somebody stamped
in a piece of paper and you didn't agree with it?

A. I don't know what I would do.

Mr. Cobeaga [appellant's counsel]: Objection, argumentative.

Mr. O'Brien: Overruled.

[Appellant:] I don't know what I would do. Each case is taken on its
own merits.

Q. I see. So you thought it was meritorious to award 20 days in jail
because the deputy stamped in a motion to dismiss?

A. In part.

Q. There was another part?

A. Yes.

Q. What other part?

A. I said she had been grossly incompetent for 13 years. This was
one of hundreds of times that she has been so incompetent.

Q. So you think that you should incarcerate people because they're
partly incompetent or in part because of incompetence?

A. In part, yes.

Q. Okay. So if you're incompetent and there's another excuse, you
put them in jail?

A. Another excuse?

Q. Yes, if they're incompetent for 13 years and you catch their
clerk, you put her in jail, is that how you do it?

A. I did in that case.

Q. Perfectly all right?

A. In that case, yes.

Q. Judicial temperance?

A. In that case, yes.

Q. You were polite and dignified and judicious in your demeanor?

A. To the letter.

the commission admitted into evidence and considered orders entered by appellant on December 6, 1985, and December 13, 1985, directing a psychiatric charge nurse and the administrator of the Southern Nevada Memorial Hospital to show cause why they "refused a court order to admit a person in the custody of the North Las Vegas Police Department into the Psychiatric Ward of Southern Nevada Memorial Hospital." Although the hospital was not a party to and had no knowledge of the underlying criminal proceeding, appellant's orders further provided that if these two individuals failed to appear at the scheduled show cause hearing, a bench warrant would issue for their arrest and confinement.

An exemplified copy of the docket or "minute" entries of the court was also admitted as evidence at the formal hearing. The entries suggest that hospital policy would not permit the criminal defendant to be admitted unless a police officer was assigned to guard the defendant during his stay. No further testimony or evidence was adduced at the commission's formal hearing respecting this incident. Based upon this evidence, the commission found that appellant "abused the contempt power vested in him by issuing orders directing the administrator of the Southern Nevada Memorial Hospital and a psychiatric charge nurse to show cause why they 'refused a court order to admit a person in the custody of the North Las Vegas Police Department into the Psychiatric Ward of Southern Nevada Memorial Hospital.' "

### The Second Loretta Bowman Incident

An exemplified copy of an order issued by appellant on July 24, 1986, in a civil matter entitled, *Hortsmann v. Oswald* was introduced into evidence in the formal proceedings. The order directed Loretta Bowman, the Clerk of the Eighth Judicial District Court, to appear before appellant and show cause why she should not be held in contempt of court for providing appellant with a calendar that "improperly designated the parties and created a confusion to the Court." An exemplified copy of the court's minutes was also admitted into evidence. Additionally, appellant testified at the formal hearing at some length concerning this matter.[24]

---

[24]Specifically, appellant testified:

Q. [The Special Prosecutor:] Exhibit 7 from the prior hearing relates to a matter which occurred—or an order which you issued July 24th, 1986, in a case called Hortsmann v. Oswald, where you entered an order against Loretta Bowman, directing her to show cause why she should not be held in contempt of court because one of her clerks transposed the first and the last names of a plaintiff in typing the daily calendar. Do you remember that one?

A. [Appellant:] Basically, yes.

Q. Now, would you tell us what the contempt was that you perceived when you issued that order?

The evidence established that a deputy clerk in Ms. Bowman's office had mistakenly transposed the first and last names of the plaintiff when typing the daily court calendar. Although appellant threatened to hold the clerk in contempt of court and punish her for the inadvertent error of her deputy, appellant subsequently quashed the show cause order. Based upon this evidence, the commission found that appellant abused his contempt power.

A.  Failing to obey the Court's rules, Eighth District Court rules.

Q.  Okay. Which rule is it that says that a deputy clerk shall not mistakenly transpose names?

A.  There is no such rule.

Q.  Well, then, you said—I don't understand, then.

A.  The calendar, by rule, Mr. Wait, has to be proper. It was improper because of her continuing negligence.

Q.  So any mistake that's made on the daily calendar would be a contemptuous mistake?

A.  It could be, yes.

Q.  Okay. So if you don't type the words in the correct order, that's contemptuous conduct?

A.  It could be.

Q.  Well, was that what this was?

A.  I guess so. I don't recall specifically. That's true.

Q.  Do I understand, then, that if any deputy clerk on any particular day would instead of John Jones, it was Jones John, they go to jail?

A.  They could.

Q.  In your court they do?

A.  I said they could.

Q.  And that's how you would conduct your courtroom?

A.  I could.

Q.  And that's the way you did?

A.  I could, and I did in that case, sure.

Q.  Okay. So on this particular instance, were you suffering from a depression that day? Was that why you found Loretta Bowman in contempt that day?

A.  I wouldn't have any idea. I'm not a psychiatrist.

Q.  Well, do you excuse this conduct because of depression?

A.  I don't excuse any conduct because of depression. I excuse my conduct because it was right.

[Appellant's counsel:] Could we have a point of clarification, Mr. Wait? If this is the same Exhibit 7 I have, it indicates that the order to show cause was quashed.

[The Special Prosecutor:] At a later time, you mean?

[Appellant's counsel:] Yes.

[The Special Prosecutor:] Well, so.

[Appellant's counsel:] Was there a—you're speaking as if there was an actual contempt citation issued. I don't think the minute order reflects that.

[The Special Prosecutor:] Let's clarify.

Q.  [The Special Prosecutor:] You issued an order for Loretta Bowman to show cause why she should not be held in contempt, right?

A.  [Appellant:] I'm taking your word for it, sure.

Q.  Okay. Well, that's the exhibit. And you at that point assumed there was some reason to find her in contempt?

A.  From what you've told me, yes.

Q.  Okay. And that was because one of her clerks had moved a first name into the position of a last name?

## *The Third Loretta Bowman Incident*

The evidence adduced at the formal hearing in this respect included exemplified copies of an order to show cause issued by appellant in a civil action on August 27, 1986, an affidavit in support of the order executed by plaintiff's counsel in the matter, and a certified copy of a transcript of pertinent proceedings in appellant's courtroom conducted on August 26, 1986.[25] Appel-

A. In part.
Q. And that was a contempt—that was contemptuous of you, right?
A. I'm sorry?
Q. Did you feel that was contemptuous of you?
A. Do you think I was guilty of contempt?
Q. Did you take that personally?
A. Do you think I was guilty of contempt? No, I don't think I was.
Q. Okay. But did you take it personally?
A. No.
Q. That she was doing this against you?
A. No.
Q. Okay. But let's go back to your answer. You said you're not excusing any of your conduct on the basis of depression; is that right?
A. That's correct.
Q. Okay. So if your conduct is a violation of the judicial ethics, you don't have an excuse for that; is that right?
A. I said my actions have all been correct. I don't need an excuse of any kind.
Q. Okay. So we don't, then, have to be concerned here about you attributing what your conduct is, right or wrong, to depression or some emotional problem?
A. I don't know what your concerns are, sir.

[25]Specifically, the transcript of the proceedings conducted in appellant's court on August 26, 1986, reads as follows:

THE COURT: Madam Reporter, this is the case that is to be reported by my request. A245307, Associates Financial Service versus Grainger. There are no appearances—there was a brief appearance by counsel, who had filed a stipulation. May I have it, please?

THE CLERK: Yes.

THE COURT: The record will reflect a stipulation was filed August 21, 11:17 a.m., 1986. Today's date is August 26, 1986, which is Tuesday, at 9:19 a.m. This stipulation that I now hold in my left hand, which was filed August 21 and stamped with the name of one Loretta Bowman, was handed to the Court just at the outset of this Court's calendar. Accordingly, this Court orders—counsel has just reentered the room—counsel for either the plaintiff or the defendants in this case to prepare an Order to Show Cause [to] be served on [Ms.] Bowman to have her appear in this Court on this Thursday, which is the day after tomorrow—today being August 26th, that will be August 28—nine o'clock, to show cause why she should not be held in contempt for not allowing this Court adequate time to consider this stipulation in the Court. Counsel?

MR. SLOANE: Forgive me, your Honor, I'm not entirely sure. When I walked in, I guess—

THE COURT: I just called the case. For the record, will you state your name, please?

lant's order directed Loretta Bowman, the Clerk of the Eighth Judicial District Court, to appear before appellant to show cause "why she should not be held in contempt of Court and a jail term imposed for her prior failure to take the Plaintiff's Motion For Judgment Against Defaulting Garnishee . . . off calendar for August 25, 1986 by reason of the Stipulation For Judgment and Order so filed and entered in said action on August 21, 1986." Based upon this evidence, the commission found that appellant "abused the contempt power vested in him by again issuing an order directing Loretta Bowman, Clerk of the Court, to appear and show cause why she should not be held in contempt of court for her prior failure to remove a matter from the court's calendar."

## The Kennard Incident

At the formal hearing, the commission admitted into evidence a certified copy of a transcript of criminal proceedings conducted in appellant's court on October 8, 1986. That transcript discloses the following:

> THE COURT: Ladies and gentlemen, that noise you hear is someone on the roof. Bailiff, you will telephone immediately and have the head of maintenance in my office awaiting my pleasure. Proceed, counsel.
> MR. HARMON: Thank you, your Honor.
> . . . .
> THE COURT: Mr. Roger, you will get the head of maintenance and bring him in here now. He is on the bench outside. Will you state your name, please?
> MR. KENNARD: Gary Kennard, K-E-N-N-A-R-D
> THE COURT: What is your position with the County of Clark?

MR. SLOANE: Jeffrey J. Sloane, on behalf of the plaintiff, Associates. I would state, your Honor, that we submitted this matter by way of stipulation after it had been set for calendar and had asked that it be taken off calendar on Friday, after we had the stipulation signed, and apparently my secretary informed me that you wanted it to be heard today anyway. I did not understand why.

THE COURT: Well, [Ms.] Bowman decided I wanted to hear it today. I don't want to hear it today. That was [Ms.] Bowman's decision. And so I am ordering counsel for the plaintiff or counsel for the defendants, or both, doesn't really matter, to do a little drafting for the Court and service for the Court to have [Ms.] Bowman served with an Order [to] Show Cause why she should not be held in contempt for not bringing this stipulation and order to my attention and having this placed on my calendar contrary to my wishes, Counsel.

MR. SLOANE: I see, your Honor.

THE COURT: Will you pass the word, please?

MR. SLOANE: Yes, your Honor, I guess I will draft something up for you.

MR. KENNARD: Maintenance superintendent.

THE COURT: All right. Do you hear a noise up on the roof?

MR. KENNARD: Yes, I do.

THE COURT: All right. Mr. Kennard, that is unforgivable. This is a murder case. Indeed it could be any kind of case. There is no such thing as a small case. I find the department of maintenance to be in direct contempt of the Court and you as the superintendent [sic] to be in direct contempt of the Court. You are, therefore, in custody, sir—have a seat up there—for 20 days in the Clark County jail. Have a seat in the box right there. Mr. Roger, you will be in charge of this individual.

MR. ROGER: Yes, sir.

Appellant testified at the formal commission hearing that, although Mr. Kennard was initially taken to jail and incarcerated, appellant later ordered his release after appellant ascertained that his (appellant's) actions had "gotten [the] attention" of county officials. Moreover, appellant insisted in his commission testimony that he had accorded Mr. Kennard his full right to be heard according to law. *See* Nev. Code of Judicial Conduct Canon 3(A)(4).[26] Specifically, in response to questioning from the special prosecutor as to whether appellant's conduct conformed to Canon 3(A)(4), appellant testified that he gave Mr. Kennard "the hearing accorded by law for direct contempt."[27]

---

[26]At the time of the proceedings against appellant, Nev. Code of Judicial Conduct Canon 3(A)(4) provided in pertinent part that "[a] judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law . . . ." This court adopted a new code of judicial conduct effective December 5, 1991. Canon 3(B)(7) of the new code provides in part that "[a] judge shall accord to every person who has a legal interest in a proceeding . . . the right to be heard according to law."

[27]Moreover, after reading the transcript of the *Kennard* contempt proceedings to appellant, the special prosecutor inquired further of appellant:

Q. That was due process of law for Mr. Kennard?
A. Yes.
Q. That's all he was entitled to?
A. Yes.
Q. Did you ask him whether he knew anything about the noise?
A. Didn't have to.

. . . .

Q. Okay. Now, then, did you give Mr. Kennard an opportunity to say he didn't know who was up there?
A. I don't know if I gave him an opportunity or not.
Q. Do you think it made any difference whether he knew anything about it beforehand?
A. Sure.
Q. In other words, if he knew about it and he didn't do something about it, he might be contemptuous in his conduct; correct?

Based upon this testimony and evidence, the commission found that appellant "abused the contempt power vested in him by holding the Clark County Department of Maintenance and the Superintendent of that department in direct contempt of court because of construction noise on the roof of the courthouse."

*The Cunningham Incident*

The facts relevant to this incident are set forth in detail in Cunningham v. District Court, 102 Nev. 551, 729 P.2d 1328 (1986). A certified copy of that decision was admitted into evidence at the formal commission hearing, along with an exemplified copy of appellant's written order holding Commander Cunningham of the Las Vegas Metropolitan Police Department in contempt of court. Additionally, appellant testified at length respecting this incident at the formal hearing and submitted as evidence a transcript of the pertinent proceedings conducted in appellant's court on October 10, 1986.

A. Quite true.

Q. But if he was innocent of any knowledge of what the sound was, he couldn't possibly be in contempt—

A. Quite true.

Q. —Could he?

A. Well, he could be, yes.

Q. Could you tell us how?

A. Well, it could be if it were the regular course of conduct, which is exactly what occurred.

Q. So, what is it, a kind of a character defect that he had that he wasn't keeping the sound away from your court?

A. That had happened on numerous occasions to the extent that every judge complained.

Q. So you're sending Mr. Kennard to jail because the other judges had been complaining about sound?

A. Yes, and myself, yes.

Q. Okay. So he wasn't contemptuous this time, you caught him for the last time, right?

A. A total [ac]cumulation, yes.

Q. Many times before and this time you got him?

A. Yes.

Q. Okay. And that was judicious and temperate?

A. Yes.

Q. Patient and courteous?

A. Yes.

Q. That was not a violation of the canon that says you're supposed to give everybody an opportunity to be heard if they have a legal interest in the proceeding?

A. An opportunity to be heard according to the law, I believe the canons say.

Q. You gave him all of his rights of law by saying did you hear that sound, and he said, yes, and he went to jail?

A. I said that's direct contempt.

Q. Okay. So that's what the law allows in the way of an opportunity to be heard?

A. Yes.

In *Cunningham,* this court vacated as void appellant's order holding Commander Cunningham in direct contempt of court and confining Commander Cunningham in the Clark County Jail. As that opinion relates, certain video tapes were seized by the police during a investigation of a bizarre set of circumstances involving an individual who had jumped to his death from an airplane. A television reporter subsequently contacted Commander Cunningham to request the release of the video tapes to the media. Because he considered them as evidence in a death investigation, Commander Cunningham declined the request. The reporter then contacted appellant to discuss the release of the tapes, and appellant subsequently telephoned the police department late in the afternoon of October 8, 1986, demanding to speak to Commander Cunningham. Upon being informed that Cunningham was not in his office, appellant told Cunningham's secretary that if Cunningham did not appear at the courthouse in ten minutes, he would have Cunningham arrested. Thereafter, the secretary was able to contact Cunningham before he left the police station for the day, and informed him of this telephone call. As the *Cunningham* opinion explains, according to the secretary, appellant did not properly identify himself[28] or the purpose of his call, did not state that the call was in relation to any specific case pending before the district court, was rude and belligerent on the telephone, and hung up abruptly without allowing the secretary to verify his name and without leaving a number at which Cunningham could return the call. Consequently, Cunningham did not attempt to respond to the telephone call at the time. *Id.* at 554, 729 P.2d at 1330.

"[A]lthough no civil action whatever involving the video tapes was presently pending before his department," appellant issued an order the following day directing Commander Cunningham to appear in appellant's courtroom and show cause why he should not be "'adjudged guilty of civil contempt for failure to obey [appellant's] order of October 8, 1986, to appear in chambers.'" *Id.* at 557, 729 P.2d at 1332. Appellant's order further indicated that appellant had ordered "'Cunningham to appear in the Chambers of Department X . . . to respond to inquiries concerning a videotape in the possession of the Las Vegas Metropolitan Police Department,'" and that the Commander had "'failed to appear as ordered.'" *Id.*

The transcript of the subsequent show cause hearing before appellant reads in material part as follows:

---

[28]The secretary believed that the caller identified himself as "George" or possibly "Judge" Goldman.

THE COURT: I believe this is Detective Cunningham, is that right? Commander Cunningham. All right. Appearance of counsel for—

MR. HAUSER: Chuck Hauser on behalf of the police department.

THE COURT: Thank you, sir. On behalf of Channel 8, who is that, please?

MR. BYRD: Christopher Byrd on behalf of Channel 8 with Mark Fierro. He is here as well, your Honor.

THE COURT: For purposes of the record, this Court ordered Mr. Byrd to prepare an Order to Show Cause to be served on Commander Cunningham for his failure to appear to this Court's order of the other day, and, Mr. Cunningham, is there anything you wish to say, sir?

COMMANDER CUNNINGHAM: I did not fail to appear to any lawful Court order would be my position.

THE COURT: Your position is my order was not lawful; is that correct, sir?

COMMANDER CUNNINGHAM: My position is I did not recognize your phone call which was relayed to me as one who was irrational, rude and would not wait for feedback as to phone numbers and as to really who you were. That is not something that I recognize as a lawful order of any Court.

THE COURT: All right, sir. Sheriff, you are here as a courtesy only; is that correct?

SHERIFF MORAN: Yes, sir.

THE COURT: I find you in direct contempt and put you in jail right now for 48 hours or until further order of the Court, whichever occurs last.

COMMANDER CUNNINGHAM: Do I have a—

MR. HAUSER: For the record, could we ask that this be transferred to a neutral judge to have a hearing on the matter?

THE COURT: That objection is not timely, Counsel. He is remanded to custody forthwith.

MR. HAUSER: For the record also, your Honor, we believe there was no direct order because there was no case in front of the Court. So, there is no contempt. Thank you, your Honor.

THE COURT: You may make your observations clear for the record. Ma'am, you will transcribe these remarks immediately.

Thereupon, Commander Cunningham was arrested, handcuffed and led to the jury box where he was required to sit with

other prisoners for approximately thirty minutes while appellant completed his calendar. He was then transported to the Clark County Detention Facility where he was photographed, fingerprinted and booked. The booking slip delivered to the jail conveyed appellant's directive: "No bail, no writs." Cunningham was held in custody for approximately five hours until his release was secured pursuant to an order of this court staying appellant's order. *Id.* at 558, 729 P.2d at 1332.

In vacating appellant's order as void, this court held that Cunningham's actions did not fall within any of the acts or omissions which constitute contempt pursuant to NRS 22.010 and NRS 199.340. Further, this court ruled:

> Cunningham was not disorderly, contemptuous or insolent. No breach of the peace, boisterous conduct or violent disturbance took place. Cunningham did not abuse the processes or proceedings of the court, nor was there a showing that he deliberately or recklessly disregarded his duties with respect to the court. Further, Cunningham did not disobey or resist any lawful writ, order, rule or process issued by the court. As Cunningham noted in his comments at the show cause hearing, the district court did not issue any lawful order to Cunningham to appear at the courthouse on October 8, 1986.

*Id.* at 559, 729 P.2d at 1333.

This court further observed:

> More importantly, it is apparent that Judge Goldman acted in excess of his jurisdiction not only when he "ordered" Commander Cunningham to appear in his chamber within ten minutes, but later when he issued the show cause order, and when he held Commander Cunningham in contempt of court. No civil or criminal action was pending before Judge Goldman during this time upon which such orders might lawfully issue. A district judge has no authority, inherent or otherwise, to issue an order to anyone to appear before him except as expressly provided by law. Because no criminal or civil action involving the right to possess the video tapes was pending before Judge Goldman, he lacked subject matter jurisdiction over the underlying dispute. Furthermore, because nothing remotely resembling a proper order had been issued and served upon Cunningham, in regard to any proper proceeding, Judge Goldman had no personal jurisdiction whatever over Cunningham. Even if the necessary action had been properly before Judge Goldman, a district judge lacks jurisdiction to order anyone to appear without cause and without reasonable notice, or outside the ordinary

process of the court. Such orders, entered without jurisdiction, constitute an abuse of judicial power.

*Id.* at 560, 729 P.2d at 1334.

Notwithstanding this court's holding in *Cunningham,* in his testimony at the formal hearing, appellant continued to insist that his actions with regard to Commander Cunningham were quite proper under the circumstances. In particular, appellant testified that "a telephone call from a judge to a police officer, under those circumstances, constitutes an order," and that Cunningham's failure to recognize appellant's telephone call as a lawful court order was "erroneous."[29] Based upon this evidence, the commission found that appellant abused his power of contempt.

Our review of the record as a whole reveals clear and convincing evidentiary support for the commission's finding of a long-standing pattern of abuse of the power of contempt. We are not persuaded, however, that sufficient evidence was adduced at the

---

[29]More specifically, appellant testified:

COMMISSIONER SPRINGER: But it's your current opinion that anyone who doesn't return a judge's phone call can be sent to jail?

APPELLANT: No. I said a phone call under those circumstances constitutes an order.

MR. O'BRIEN: Even with no case pending?

APPELLANT: Yes, sir.

COMMISSIONER PUCCINELLI: That bothers me, above all of what you said, that bothers me more than anything else. Now, what circumstances? Here is a TV station that's come in and said we want to see this film or get a copy of it or something or other. Is that the circumstance you're referring to?

APPELLANT: Yes, sir. A judge would act under those circumstances as the shield in the combination of a shield and a sword. And that is shielding the public, in this case it was media, they are a part of the public, from the acts of the police department without judicial process, yes.

COMMISSIONER PUCCINELLI: Now, tell me this. If it hadn't been the media, had it been Joe Blow off of the street who said, hey, I had a film over here that was taken, I would like to get it back or get a copy of it, at least, would you have had the same attitude with that?

APPELLANT: I presume so, yes.

COMMISSIONER PUCCINELLI: In other words, anyone who comes into your office and says I loaned my car to somebody and they haven't brought it back and I want it back right now, and you call up a policeman and say, hey, let's find out about why this car hasn't been returned, if you're not here in ten minutes you're in contempt?

APPELLANT: All I said, an order to show cause would be served.

Appellant also specifically testified:

THE SPECIAL PROSECUTOR: So the last thing [Cunningham] said was: "That is not something that I recognize as a lawful order of any court." Is that an unreasonable position?

APPELLANT: Erroneous.

formal hearing to support the commission's specific findings respecting the Gordon Yach and the Southern Nevada Memorial Hospital incidents.

More specifically, without the testimony contained in the transcript of the probable cause hearing, which the commission expressly declined to consider at the formal hearing, the evidence of record regarding Mr. Yach and the hospital established little more than the fact of appellant's entry of show cause orders. Moreover, the record reflects that appellant was not questioned and did not testify at the formal hearing about either of these matters. We conclude that, as a matter of law, the show cause orders standing alone are insufficient to establish that appellant abused his power of contempt on these specific occasions. Sufficient clear and convincing evidence, however, does support the findings of abuse relating to the remaining incidents.

Appellant nonetheless contends that the documentary evidence supporting the commission's findings was improperly admitted and considered at the formal hearing and, therefore, the evidence should be deemed insufficient. Specifically, appellant argues that the transcripts of the hearings that appellant conducted, the show cause orders and orders of contempt that he entered and the opinions of this court that reversed his orders of contempt were all erroneously admitted and considered because "absolutely no evidentiary foundation [was] laid for the introduction of these exhibits or for the hearsay contained therein upon which the Commission apparently placed heavy reliance." Appellant also asserts without further explanation that the admission of this documentary evidence was "intensely prejudicial." We disagree.

At the time of the formal hearing, Interim Rule 14(a) provided:

> The commission is not bound by technical rules of procedure, and may conduct its inquiries and hearings according to such rules as it may determine expeditious and fair. In doing so, the commission shall endeavor to confine the receipt of evidence to that which is admissible under the Nevada Evidence Code; provided, that no error in the admission of evidence will be considered grounds for appeal unless made to appear prejudicial to the fundamental fairness of the proceedings.

As the special prosecutor persuasively argues, in conducting its proceedings fairly and expeditiously, the commission appropriately took judicial notice of the opinions of this court and the other certified and exemplified public court documents in issue. *See* NRS 47.130(1) (court may take judicial notice of facts in issue or facts from which facts in issue may be inferred); NRS

47.130(2) (a judicially noticed fact must be generally known within the jurisdiction or capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned). Additionally, at the time of the proceedings, Interim Rule 34 provided:

> The commission may examine a decision or opinion of a judge to the extent that such a decision or opinion is incident to a charge of misconduct or disability. Such examination shall not constitute appellate review.

Thus, appellant's orders and the other district court documents relating to appellant's contempt decisions were properly admitted and considered by the commission. Moreover, in its final judgment, the commission noted that appellant was "given an opportunity to and did explain to the Commission the circumstances and reasoning underlying his issuance of the show cause orders and contempt citations." We therefore perceive no error that could be considered prejudicial to the fundamental fairness of the proceedings.

Next, appellant contends that because he was not given prehearing notice as required by Interim Rule 11(a), the commission improperly admitted and considered a transcript of proceedings during which appellant ordered Ms. Bowman to appear and show cause why her deputy did not remove an item from the court's calendar. Pursuant to Interim Rule 11(a)(2), the special prosecutor was required to disclose to appellant any written or recorded statements in the special prosecutor's possession or control within twenty days after service of notice of the formal hearing. Although such notice of the transcript in question was not provided, our review of the record reveals that the transcript merely supplemented appellant's testimony at the formal hearing and the other, properly admitted documentary evidence relating to this incident. Accordingly, we conclude that appellant has failed to demonstrate prejudice to the fundamental fairness of the proceedings. *See* Interim Rule 14(a).

Appellant also contends that the commission's order of formal complaint provided him with inadequate notice to defend against the charges relating to the show cause orders appellant issued in the Gordon Yach incident, the Southern Nevada Memorial Hospital incident, and the second and third Loretta Bowman incidents.[30]

---

[30]As noted above, we have concluded as a matter of law that insufficient evidence supports the commission's findings with respect to the Gordon Yach and the Southern Nevada Memorial Hospital incidents. Accordingly, we need not consider this contention as it relates to those matters.

*See* Interim Rule 15(a) ("[a] respondent shall have the right and reasonable opportunity to defend against the charges . . ."); Interm Rule 9(b) (notice of the hearing "shall specify in ordinary and concise language the charges against the respondent and the alleged facts underlying the charges . . ."); Interim Rule 1.3 (where probable cause for disciplinary action is found, the special prosecutor has the duty to "sign and file with the commission a formal statement of charges").

As the special prosecutor observes, however, appellant had reasonable notice that his orders to show cause would be at issue in the proceedings before the commission. The order of formal complaint advised appellant that it appeared that he had "abused his contempt power by holding or *threatening to hold* individuals in contempt of court under circumstances clearly not warranted by law." (Emphasis added.) Further, the order of formal complaint specifically cited numerous contempt orders issued by appellant against Loretta Bowman. Therefore, we agree with the special prosecutor that, under the totality of the circumstances, appellant was provided a reasonable opportunity to defend against the commission's findings relating to the show cause orders concerning Loretta Bowman.

Appellant further contends that the evidence in the record does not support the commission's findings that he abused his contempt power with respect to the incidents involving Commander Cunningham, Mr. Kennard, the District Attorney, and Ms. Bowman. Specifically, appellant asserts that Commander Cunningham's allegedly "insolent behavior" and Kennard's alleged responsibility for the disturbance on the roof of the courtroom constituted valid predicates for his orders of contempt. *See* NRS 22.010(1) (disorderly, contemptuous or insolent behavior toward a judge while the judge is holding court shall be deemed a contempt). Similarly, appellant continues to maintain in this appeal that his orders adjudging Ms. Bowman and the Clark County District Attorney in contempt constituted a valid and proper exercise of his power to issue contempt citations where there have been violations of court rules. *See* NRS 22.010(3).

As noted above, however, we have concluded that the commission properly admitted and considered as evidence this court's prior opinions in Cunningham v. District Court, 102 Nev. 551, 729 P.2d 1328 (1986); Bowman v. District Court, 102 Nev. 474, 728 P.2d 433 (1986); and Clark Cty. Dist. Atty. v. District Court, 101 Nev. 843, 710 P.2d 1384 (1985). The contentions appellant here advances were emphatically rejected in those decisions. Further, although the Kennard incident was not the subject of any prior opinion of this court, the documentary and testimonial evidence pertaining to that matter clearly establishes that appel-

lant's conduct deprived Mr. Kennard of any opportunity whatsoever to explain his position or respond to appellant's concerns prior to appellant's issuance of the order jailing Mr. Kennard. *See* Ryan v. Com'n on Judicial Performance, 754 P.2d 724, 732 (Cal. 1988) (court found judge abused contempt power and committed willful misconduct when, in contempt proceedings, judge completely ignored proper procedures and never gave the individual a chance to respond prior to ordering her incarceration); *see also* Nev. Code of Judicial Conduct Canon 3(A)(4) (a judge should accord every person who is legally interested in a proceeding full right to be heard according to law). Thus, contrary to appellant's contentions, documentary and testimonial evidence properly adduced at the commission's formal proceedings demonstrated conclusively that appellant abused his power of contempt on these occasions.

Appellant also contests the commission's conclusion that his show cause orders and contempt rulings constituted "willful misconduct" warranting his removal from office. Appellant observes that, even assuming that his contempt rulings were erroneous, absent a finding of "bad faith," his "erroneous legal rulings cannot form the basis for discipline in the form of removal for 'willful misconduct.' " *See, e.g.*, Matter of Sheffield, 465 So.2d 350, 358 (Ala. 1985) (judge could not be disciplined for contempt ruling which he later rescinded absent a showing of bad faith or a state of mind affirmatively operating with furtive design or ill will); Matter of Johnson, 395 A.2d 1319, 1326 (Pa. 1978) (judges acting in pressure-laden situations should not be required to fear automatic discipline because a contempt ruling might later be reversed on appeal). *See also* Comm. Rule 9.[31] Thus, appellant maintains, because "there is no clear and convincing evidence to show [appellant] to have been motivated by malice, ill will, or bad faith," the commission's conclusion that he committed willful misconduct warranting removal from office must be reversed.

It is true, of course, as Comm. Rule 9 currently reflects, that the commission may not function as an appellate body and is "a

---

[31]Comm. Rule 9, which became effective in April 1988, currently provides in part:

> In the absence of fraud or like bad faith occurring in the commission of an act constituting a ground for discipline . . . the commission must take no action against [a] judge for making findings of fact, reaching a legal conclusion, expressing views of law or policy in a judicial opinion, or otherwise declaring or applying the law in the course of official duties. The commission has no jurisdiction to review or to base charges upon differences of opinion between judges as to matters of law or policy, or as to other issues committed to judicial or administrative discretion. Claims of error must be left to the appellate process.

singularly inappropriate forum in which to correct erroneous judicial decisions made in good faith." *See* Matter of Hague, 315 N.W.2d 524, 531 (Mich. 1982). Indeed, bad faith is an element essential to a finding of willful misconduct arising out of the issuance of a judicial decision. Contrary to appellant's contention, however, in this instance the commission neither undertook to function as an appellate body, nor was its finding of willful misconduct unsupported by clear and convincing evidence of appellant's bad faith. Rather, the commission correctly concluded that erroneous contempt rulings, which also demonstrate a long-standing abuse of contempt power, may be properly considered as willful misconduct. *See, e.g.,* Cannon v. Commission on Judicial Qualifications, 537 P.2d 898 (Cal. 1975); Matter of Del Rio, 256 N.W.2d 727 (Mich. 1977), *appeal dismissed,* 434 U.S. 1029 (1978); Matter of Yengo, 371 A.2d 41 (N.J. 1977). *See also, Hague,* 315 N.W.2d at 533 (abuses of the awesome power of contempt, including unjustified threats to hold persons in contempt, constitute misconduct warranting discipline).

As the evidence detailed above illustrates, Judge Goldman was an experienced judge who continued to ignore binding precedent reversing his contempt rulings and emphasizing the importance of a district court's strict adherence to the provisions of NRS 22.010 and NRS 199.340. An experienced trial judge's ignorance of proper contempt procedures, *without more,* has been held to constitute the bad faith necessary to a finding of willful misconduct. *See Cannon,* 537 P.2d at 909. *See also* Furey v. Com'n on Judicial Performance, 743 P.2d 919, 929 (Cal. 1987) (willful misconduct found where judge seemed to have learned nothing from fact that several prior contempt orders had been set aside and continued to engage in a pervasive course of conduct of overreaching his authority). Additionally, by ordering Commander Cunningham to appear in his court when no matter requiring Cunningham's attendance was pending in appellant's department, appellant committed a serious misuse of his judicial office warranting a finding of bad faith and willful misconduct. *See Cannon,* 537 P.2d at 913-15 n.19. *See also* Kloepfer v. Com'n on Judicial Performance, 782 P.2d 239, 257 (Cal. 1989).

The California Supreme Court has also held that a finding of bad faith is warranted where, as here, the evidence discloses the commission of acts which the judge knew or should have known were beyond the judge's power for a purpose other than the faithful discharge of judicial duties. *See* Wenger v. Commission on Judicial Performance, 630 P.2d 954 (Cal. 1981). The commis-

sion specifically found that appellant's behavior resulted from his "inaccurate perception of his role as a judge, and from his unwillingness to tolerate actions by others which are not in harmony with his apparent belief that those who do not meet or respond to his demands and expectations are subject to imprisonment and punishment under the court's contempt power." Appellant's testimony with respect to the incidents in issue—particularly the Loretta Bowman incidents and the Kennard incidents—clearly and convincingly supports this finding and demonstrates that appellant acted for a purpose other than the faithful discharge of his duties. Such behavior constitutes precisely the "bad faith" contemplated by Comm. Rule 9. As one court has observed:

> By "bad faith," we do not mean to imply that petitioner sought to harm the interests of the defendants involved. Rather, we mean that in indulging his petty animosity toward deputy public defenders, and in culmination of a pervasive course of conduct of overreaching his authority over subordinates, petitioner intentionally committed acts which he knew or should have known were beyond his lawful power. The resulting misconduct entailed the most insidious kind of official lawlessness—disregard for the statutory and constitutional rules by which a society of millions and a heritage of centuries have sought to preserve fundamental fairness with a legal system which cannot escape the inherent imperfections of mankind.

*Geiler,* 515 P.2d at 11. *See also Ryan,* 754 P.2d at 732 (failure to know of or research proper contempt procedures constituted "bad faith" under two-prong *Wenger* test).

We are constrained to add that appellant's continued failure to acknowledge either the impropriety of his actions or the binding authority previously enunciated by this court reveals, in our view, a disturbing predilection toward "a personal brand of justice in which the judge becomes a law unto himself . . . ." *See* Matter of Ross, 428 A.2d 858, 861 (Me. 1981). "A judge who may disagree with the appellate authority must, nevertheless, lay aside his own opinion of the validity of the law and dispose of the cases before him in accordance with the precedent. Whatever his contrary personal view of appellate authority, a judge is not free to disregard it." *Hague,* 315 N.W.2d at 532; *see also* Nev. Code of Judicial Conduct Canon 3(A)(1) (a judge should be faithful to the law and maintain professional competence). In our view, the widespread publicity that attached to appellant's repeated and defiant abuse of his contempt power, even in the face of settled and binding case precedent, seriously endangered public esteem

for the judiciary. "[U]nable to see that he was the servant of law and not its embodiment," the evidence indicates that appellant sought to "set himself above it." *Hague,* 315 N.W.2d at 536.

## VI. *WILLFUL MISCONDUCT: IMPROPER PUBLIC COMMENT*

The commission found that appellant violated Canon 3(A)(6) of the Nevada Code of Judicial Conduct by making public comments concerning pending and impending litigation.[32] The commission found that such violations of the code occurred in October 1986, and in April and May of 1987. Accordingly, the commission concluded that appellant had engaged in a "pattern of making improper comments to news media concerning pending and impending litigation." Further, in light of their "persistent and improper nature," the commission concluded that appellant's improper public remarks must be deemed willful misconduct constituting an independent basis for removal.

Appellant contends that the commission's findings and conclusions respecting the comments appellant made in April and May of 1987 cannot be sustained and must be reversed.[33] We agree.

All the remarks in question were made by appellant and

---

[32]Nev. Code of Judicial Conduct Canon 3(A)(6) provides:

A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to his direction and control. This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.

[33]Specifically, the commission found:

The Commission also finds that [Judge Goldman] made the following public comments concerning proceedings pending before this Commission and the litigation initiated by him in the First Judicial District Court, and also concerning other proceedings he allegedly contemplates filing. Regarding the mandamus proceedings pending before the First Judicial District Court, [Judge Goldman] is quoted by the Las Vegas Review Journal on May 6, 1987, as stating that he would appeal the court's adverse decision, "but my prospects of success are remote," and that various state officials were wasting money "trying to crucify me," and that various state officials had spent far more on investigations, court cases and assigning judges temporarily to fill his vacancy than they would spend on his retirement, and that all he wants "is retirement," adding "I'm angry. I want to leave with dignity." [Judge Goldman] is also quoted by this same newspaper on May 7, 1987, as stating: "There was no way I could win. Events tell me the whole thing was rigged." Further, [Judge] Goldman is also quoted by the Las Vegas Review Journal on three more occasions: (1) On April 22, 1987, "I'm like a pupfish. Maybe you can swallow me. But boy, it's going to hurt"; (2) On April 21, 1987, "These people have always thought, and will continue to think, that I'm bluffing. I never bluff. But

reported in the media *after* the commission conducted its probable cause hearing and *after* the commission entered its order of formal complaint. The special prosecutor did not thereafter attempt to amend the formal complaint to allege that these remarks constituted misconduct, nor did he provide notice to appellant that the exhibits (newspaper articles) pertaining to the comments in question would be submitted as evidence at the formal hearing. *See* Interim Rule 9(b) (notice must be provided to judge of charges against him and the alleged facts underlying the charges); Interim Rule 11(e) (the special prosecutor shall promptly provide discovery of any additional materials or information subject to disclosure). Consequently, no evidence of these remarks was admitted at the probable cause hearing, nor did the commission's order of formal complaint impart notice sufficient to provide appellant with a "reasonable opportunity to defend against the charges." *See* Interim Rule 15(a). *See also* Kennick v. Com'n on Judicial Performance, 787 P.2d 591, 598 (Cal. 1990) (court refused to adopt commission determinations based upon findings outside scope of a notice of formal proceedings). Under these circumstances, and despite appellant's failure to request a continuance, we conclude that it was fundamentally unfair to require appellant to defend against these charges at the formal hearing. We therefore vacate the commission's findings respecting these remarks. In so doing, we necessarily reject the commission's determination that appellant engaged in a pattern of making improper comments.

As noted above, however, the commission also found that appellant improperly commented on pending litigation, the *Cunningham* matter, in October of 1986. We have considered appellant's contentions respecting this finding, and we conclude that they are without merit. Further, we conclude that, when coupled with appellant's willful misconduct relating to his long-standing abuse of the judicial contempt power, sufficient willful misconduct was established on this record to warrant the sanction of removal.

## VII. *HABITUAL INTEMPERANCE*

In each instance in which the commission determined that appellant's conduct constituted willful misconduct, the commis-

---

they think I'm bluffing. . . . The governor won't act. The law says the governor must appoint doctors. He won't let me retire, and I want to retire. I've wanted to retire since 1980. I want him to obey the law. They can come by and examine me or my records. I'm obviously disabled."; and (3) On April 23, 1987, [Judge Goldman] is quoted as communicating his intentions to file a federal civil rights action to "punish" those who have tried to harm him since last fall.

sion further determined that appellant had engaged in "habitual intemperance." Prior to the formal hearing, appellant moved the commission to strike the reference to habitual intemperance contained in the order of formal complaint because, appellant maintained, the term generally connotes alcohol abuse. Appellant noted that no evidence had been presented to the commission implicating appellant's indulgence or overindulgence in alcohol.

In rejecting appellant's contention, the commission ruled:

> As used in our order, however, "habitual intemperance" is extreme or excessive behavior, marked by a lack of moderation, conduct that is not temperate. *See* Webster's Ninth New Collegiate Dictionary, p. 1214 (1983) (definition of temperate); *see also* Matter of Del Rio, 256 N.W.2d 727 (Mich. 1977) (a judge should be temperate, patient, courteous, and considerate to counsel and others appearing before him; proper judicial temperament is displayed when a judge discharges his duties in a professional manner with patience, courtesy and dignity).

On appeal, appellant renews his contention and asserts that, as a ground for judicial discipline, the term "habitual intemperance" should be limited in its scope to the abuse of alcohol. *See* Matter of Mikesell, 243 N.W.2d 86, 94-95 (Mich. 1976) (a charge of "habitual intemperance" cannot be sustained without a finding of abuse of alcohol). Consequently, appellant argues, because there is no evidence in the record to support even an inference of his abuse of alcohol, the commission's finding of habitual intemperance must be reversed. We agree.

Although the Interim Rules governing the commission proceedings against appellant did not define the term "habitual intemperance," this court has since defined the term in procedural rules which became effective on April 29, 1988. Specifically, Comm. Rule 2(6) now provides: " 'Habitual intemperance' means habitual, excessive use of alcohol, or chronic abuse of any other substance which affects mental processes, awareness, or judgment." In our view, this definition more closely comports with the widely accepted meaning of the term. We therefore reject the special prosecutor's contention that a finding of habitual intemperance is justified when a judge's conduct demonstrates a pattern of conduct and temperament totally unbecoming a member of the judiciary. Conceptually and under our constitution and rules, conduct demonstrating a pattern of judicial temperament wholly unbecoming a member of the judiciary more appropriately falls within the term "willful misconduct." *See* Comm. Rule 2(7); Comm. Rule 11. Thus, although a finding of "habitual

intemperance," as the term was defined by the commission, is supported by the evidence in the record, such a finding appears to focus on the same conduct that underlies the commission's additional findings of "willful misconduct." *See Furey,* 743 P.2d at 923 (court declined to consider "overlapping" charges). Accordingly, we vacate the commission's determination that appellant engaged in "habitual intemperance."

## VIII. *MEDICAL CONDITION AS MITIGATION OR EXCUSE FOR MISCONDUCT*

The commission found and concluded as follows:

1. [Judge Goldman's] own physician, Dr. Mayor, testified that he can determine no organic basis for claimed disability.

2. [Judge Goldman's] own physicians do not identify, to the satisfaction of this Commission, any mental or physical condition which would explain his persistent abuse of contempt power or the other events of misconduct described above. While Dr. Thornton, one physician who examined [Judge Goldman] on behalf of the special prosecutor, agreed [Judge Goldman] was suffering from depression and stress, which Dr. Thornton thought contributed to [Judge Goldman's] inappropriate acts, there is no suggestion in the testimony of either [Judge Goldman's] expert witnesses or in the testimony of Dr. Thornton that [Judge Goldman] at any time did not know the difference between right and wrong or that he failed to understand the nature and quality of his actions.

3. The Commission is persuaded by the testimony of Dr. Gerow that [Judge Goldman's] actions are not adequately explained or justified by the fact that he may be temporarily depressed, and the Commission determines as a matter of fact that Dr. Gerow has accurately testified to the facts concerning [Judge] Goldman's behavior.

4. In weighing the testimony of various experts and in according credit to the testimony of Dr. Gerow, the Commission has noted and finds as a fact that numerous incidents of abuse of power and improper public statements reflect conscious deliberation and planning inconsistent with any claim that [Judge Goldman] was either acting pursuant to an irresistible impulse or that he did not know the difference between right and wrong or know the nature and quality of his actions.

5. Furthermore, the Commission finds as a fact, that [Judge Goldman's] various abuses of power and other misconduct have extended over a long period of time during

which [Judge Goldman] has been quite functional in other areas of his life and judicial activities, which fortifies the Commission in its determination that [Judge Goldman] has the capacity to tell the difference between right and wrong. The Commission believes [Judge Goldman] understood the nature and quality of his actions, and that he could control his conduct were he so disposed.

6. Based on [Judge Goldman's] testimony and behavior on the witness stand as perceived by the Commission, and based on the testimony of Dr. Gerow, the Commission finds, as a fact, that [Judge Goldman] has failed in his burden of proving that his various inappropriate actions, as referred to in the above findings, resulted from disability. The Commission also finds affirmatively that the Commission's counsel has demonstrated clearly and convincingly such inappropriate conduct did not result from any disability which can be deemed to excuse his conduct.

7. To the extent that the Commission can discern reasons for [Judge Goldman's] misbehavior, the Commission finds, as a fact, that [Judge Goldman's] behavior has resulted from [his] inaccurate perception of his role as a judge, and from his unwillingness to tolerate actions by others which are not in harmony with his apparent belief that those who do not meet or respond to his demands and expectations are subject to imprisonment and punishment under the court's contempt power.

8. Based on the foregoing findings, the Commission further finds that [Judge Goldman's] misconduct, as described above, is not excused, and must, therefore, be deemed willful misconduct . . . .

Our review of the record reveals clear and convincing evidentiary support for the commission's findings. In particular we note that, when questioned whether specific instances of alleged misconduct may have been due to depression, appellant insisted, "I don't excuse any conduct because of depression. I excuse my conduct because it was right." Additionally, in his motion to amend and strike certain portions of the commission's order of formal complaint, appellant maintained that he had "not tendered the issue that my allegedly improper conduct was the product of any disability, either directly or indirectly."[34] These statements,

---

[34] We note, however, that in closing remarks before the commission at the formal hearing, appellant's counsel, Mr. Cobeaga, stated: "I agree with Mr. Wait with the way this matter is now at issue, three catagories, the allegation of misconduct, then whether that is excused by any condition of the Judge's, and, finally, the issue of whether the Judge draws compensation now at age 53 rather than at age 60."

when coupled with the failure of appellant's counsel and experts to establish any correlation between appellant's condition and his willful misconduct, provide more than adequate support for the commission's finding that appellant failed in his burden to show that any misconduct resulted from or was excused by disability.

Even discounting appellant's statements, however, our review of the record reveals that, although Dr. Thornton indicated that some of appellant's misconduct could have been a manifestation of his depression, Dr. Gerow emphatically testified that it was "absurd to raise [the] possibility" that depression was the cause of any of the allegations of misconduct in question. Assuming without deciding that serious physical or mental disability could have even constituted a defense with respect to appellant's removal,[35] Dr. Thornton's equivocal statement was insufficient to establish a direct relationship between the misconduct in issue and appellant's physical or mental condition. *See* Matter of Yaccarino, 502 A.2d 3, 30 (N.J. 1985) (court rejected judge's contention that medical condition constituted mitigating circumstance sufficient to excuse unethical conduct where medical evidence did not directly relate to judge's motive or intent). Accordingly, we conclude that appellant not only failed to fulfill his burden of proof but also that the evidence affirmatively established that appellant's misconduct was neither mitigated nor excused by a disabling condition.

## IX. *ABANDONMENT AND RELINQUISHMENT OF OFFICE*

The commission specifically found and concluded:

> 1. [Judge Goldman] has not performed the duties of his office since October 19, 1986. He is not presently performing any of his judicial duties. He has not offered to perform those duties, and has not requested the Supreme Court to vacate the order relieving him of judicial authority, which he solicited. Indeed, he stated at the hearing on June 12, 1987, that he has no desire to return to work, he claims he is unable to work as a judge, and he asserts that he has no intention of ever returning to the bench.
>
> 2. By written declaration to the Governor, [Judge Goldman] first asserted his intention to relinquish his office on October 30, 1986, and has performed no further judicial service since that time.[36]

---

[35]*See* Kennick v. Com'n on Judicial Discipline, 787 P.2d 591, 616-17 (Cal. 1990) (protection of the public and integrity of the judiciary preclude allowing judge's physical or emotional difficulties to bar a determination of conduct warranting discipline).

[36]The text of appellant's letter to the governor is set forth in Goldman v. Bryan, 106 Nev. 30, 33, 787 P.2d 372, 374 (1990).

3. By written declaration to the Governor, subsequently placed in evidence with this Commission, by public declarations to the news media, by written pleadings to the Commission, and by testimony to this Commission, [Judge Goldman] has announced his irrevocable intention to abandon his judicial office and his clear intention not to resume performance of his judicial duties.

4. The Commission concludes, therefore, that [Judge Goldman] has voluntarily abandoned and relinquished his judicial office, and that, therefore, it must declare the office vacant.

Our review of the record reveals clear and convincing evidentiary support for the commission's findings. Appellant's unequivocal testimony before the commission that he had "no desire whatever to return to being a judge" and the additional statements and declarations in appellant's letter to the governor and in appellant's formal answer dispel any question as to the sufficiency of the evidence supporting the commission's findings.

Moreover, based upon these findings, the commission properly concluded that a formal declaration of vacancy was warranted. For all practical purposes, appellant's office had remained without an active, full-time presiding judge for approximately nine months. There was an evident need for the full complement of judges in the Eighth Judicial District, a judicial district which has experienced a steady and extraordinary increase in population in the last decade. Confronted with such an imperative, together with appellant's insistence that he believed himself incapable of performing *any* of the functions of his office and that he had "no intention whatever" of returning to the bench, we conclude that the commission's action was necessary and proper. Indeed, declaring appellant's office vacant on this ground minimized the prospect that an appeal challenging the commission's remaining findings respecting disability retirement or removal for misconduct might needlessly delay or confuse the process of selecting a successor judge, notwithstanding appellant's stated intention never to return to the bench.

Appellant has asserted on appeal, however, that pursuant to NRS 3.080(1), only the governor may declare a vacancy in the office of district judge and, therefore, the commission lacked jurisdiction to take such action.[37] We disagree. The commission did nothing more than acknowledge a *de facto* vacancy of long duration which appellant's own testimony and actions unequivocally confirmed. We recognize, of course, that appellant never

[37]NRS 3.080(1) provides: "The governor shall declare vacant the office of district judge."

sought to retire unconditionally. Quite to the contrary, appellant sought an early, enhanced disability retirement that was vastly more advantageous financially than the normal retirement he had earned and which the commission ultimately found to be his only entitlement. Nonetheless, appellant never indicated that, in the absence of a finding that he was entitled to a disability pension, he would attempt to remain on the bench. Nor did he offer or request permission to resume his duties in a limited capacity with a reduced workload designed to accommodate his circumstances. Rather, appellant's statements and actions evidenced a clear intention never to resume any judicial functions under any circumstances. Consequently and in light of the commission's remaining findings, we fail to discern how appellant was prejudiced, even assuming that the commission exceeded its authority by declaring appellant's office vacant.

In any event, the Nevada Constitution specifically empowers the commission to remove a judge from office for "willful misconduct, willful or persistent failure to perform the duties of his office or habitual intemperance . . . ." *See* Nev. Const. art. 6 § 21(6)(a). Further, the commission is authorized to retire a judge for advanced age or for a disabling mental or physical condition that is likely to be permanent in nature. *See* Nev. Const. art. 6, § 21(6)(b). The power to adjudicate and order the removal or retirement of a judge must necessarily imply the power to declare the office vacant. *See generally* Galloway v. Truesdell, 83 Nev. 13, 422 P.2d 237 (1967). To the extent that the commission's exercise of this implied authority may have conflicted with any express ministerial duty imposed upon the governor by the legislature, the commission's power was clearly preeminent. *See* Goldman v. Bryan, 106 Nev. 30, 37, 787 P.2d 372, 377 (1990) (citing Robison v. District Court, 73 Nev. 169, 175, 313 P.2d 436, 440 (1957)). To hold otherwise would elevate form over substance. Accordingly, we conclude that the commission acted entirely within the ambit of its lawful authority.

Appellant further complains that he was deprived of due process of law because the commission failed to provide him with fair and sufficient notice of "the charge of his allegedly having 'voluntarily abandoned and relinquished his judicial office.'"[38]

---

[38]No allegation of willful or persistent failure to perform judicial duties was alleged in the commission's initial order of formal complaint as a ground for removal. Nor did the commission expressly purport to decide that removal was warranted by appellant's willful or persistent failure to perform his judicial duties. Nonetheless, appellant's abandonment and relinquishment of his office was placed in issue by the documentary evidence appellant presented at the probable cause hearing, by the statements in appellant's

*See generally,* In re Ruffalo, 390 U.S. 544 (1968). We note, however, that both the commission's order clarifying issues and its earlier order of formal complaint adequately apprised appellant that the commission considered appellant as having acknowledged that he would not continue in judicial office. The order clarifying issues not only indicated that the facts and circumstances surrounding this issue constituted one of three distinct issues then pending in the proceedings, but also that, under these circumstances, the commission considered appellant to have "vacated his office." Moreover, as noted, the matter was initially placed in issue by the only evidence appellant submitted at the probable cause hearing, *i.e.,* appellant's letter to the governor declaring that he was unable to perform the duties of his office. The statements and declarations in appellant's own verified answer further served to focus the issue, and at no time did appellant register any concrete objection to the commission's stated intention to declare his office vacant at the formal hearing. Thus, appellant had adequate notice that this matter was in issue, well in advance of the formal hearing. Consequently, we perceive no procedural irregularity. *See* Gruenburg v. Kavanagh, 413 F.Supp. 1132 (E.D. Mich. 1976). Nor do we perceive any actual prejudice that may be attributed to the purported irregularity. *See* In re Robson, 500 P.2d 657 (Alaska 1972).

## X. *THE MOTION TO DISQUALIFY*

Nevada Supreme Court JUSTICE CHARLES E. SPRINGER sat as a member of the commission in this matter. At the commencement of the probable cause proceedings, JUSTICE SPRINGER made the following statement on the record:

> I would like the record to reflect that I communicated with Mr. Cobeaga and told him that because I have been [a] political adversary, for lack of a better expression, of Judge Goldman, that I offered to disqualify myself voluntarily, without cause. And I was advised by Mr. Cobeaga that I would not be challenged and that Judge Goldman had no objection to my serving on the Commission in his case. And I just wanted that to be a matter of record.

---

answer and other written pleadings and by appellant's testimony. Thus, appellant himself clearly established that he had not and would not perform his judicial duties. Although the commission may only remove or retire a judge on one or more of the constitutional grounds specified above and in the manner specified in its rules, nothing in the constitution or the rules forecloses the commission from acknowledging that, during the course of removal and retirement proceedings, a vacancy has been established by a judge's own unequivocal declaration of an intention not to return to the bench.

In response, appellant's counsel Mr. Cobeaga confirmed, "That's correct, Your Honor."

Notwithstanding appellant's rejection of JUSTICE SPRINGER's offer to remove himself from the commission, one week prior to the scheduled formal hearing, appellant moved the commission to disqualify JUSTICE SPRINGER from further participation in the proceedings. Appellant asserted that "new information" had come to his attention, after he initially assented to JUSTICE SPRINGER's participation, which revealed that in October of 1986, JUSTICE STEFFEN had conducted an inquiry on behalf of this court into appellant's behavior on the bench.

At the formal hearing, the special prosecutor opposed appellant's motion and read a statement from JUSTICE SPRINGER into the record. The statement explained that JUSTICE SPRINGER was not biased, that he harbored "no ill will nor ill feelings against Judge Goldman," and that he felt he could "sit impartially in this matter." Further, JUSTICE SPRINGER explained that he had played no role in JUSTICE STEFFEN's initial tentative inquiry.

The five other members of the commission subsequently denied appellant's motion. More specifically, the other commission members concluded as follows:

> At the outset of the hearing on June 12, 1987, [Judge Goldman] belatedly attempted to challenge the participation in the proceedings of a Commission member whose participation [Judge Goldman] had previously accepted and stipulated to. The five other members of the Commission voted unanimously to deny [Judge Goldman's] motion as tardy and without merit. However, the five other sitting members of the Commission, whose participation has not been challenged and who constitute a quorum to take action herein, have further determined that their deliberations and votes in this matter, as set forth herein, would be the same, and would have been the same without the participation and votes of the Commission member whom [Judge Goldman] belatedly attempted to challenge.

On appeal, appellant contends that the commission's refusal to disqualify JUSTICE SPRINGER from the proceedings constitutes prejudicial error. Appellant alleges that, at the time he initially rejected JUSTICE SPRINGER's offer of recusal, he was unaware that JUSTICE STEFFEN, on behalf of the supreme court, had conducted an investigation into appellant's fitness to remain on the bench. Further, appellant asserts that his knowledge of the supreme court's role was "radically altered" by "new information" he received on May 4, 1987, well after he agreed to JUSTICE SPRINGER's participation, when he first became aware of information

contained in a "Certificate In Lieu of Record," authored by JUSTICE STEFFEN. Appellant maintains that the certificate revealed to him for the first time that this court had conducted an administrative inquiry into his behavior. *See* Goldman v. Bryan, 104 Nev. 644, 764 P.2d 1296 (1988). Thus, appellant maintains, he initially assented to JUSTICE SPRINGER's participation only because he had no knowledge of the facts detailing the extent of the supreme court's inquiry into his fitness. Appellant also argues that the facts revealed by the certificate raise an appearance of partiality in the mind of a reasonable observer sufficient to require JUSTICE SPRINGER's disqualification from the commission under Nevada Code of Judicial Conduct, Canon 3C(1)(a).[39] We disagree.

First, as the special prosecutor observes, JUSTICE STEFFEN's certificate indicates that, as early as October 16, 1986, two of appellant's counsel knew that JUSTICE STEFFEN was investigating, on behalf of the supreme court, events that had become "public knowledge bearing on appellant's fitness to remain on the bench." Further, on March 30, 1987, appellant's counsel specifically confirmed on the record that appellant had no objection to JUSTICE SPRINGER serving as a member of the commission in this case. Thus, the record establishes that, in October of 1986, appellant's counsel knew the facts subsequently asserted in support of the allegations contained in the motion to disqualify, and thereafter expressly waived any objections to JUSTICE SPRINGER's participation. Moreover, appellant formally raised the allegations of impropriety only after learning of the outcome of the probable cause proceeding. Under these circumstances, we conclude that appellant waived his right to challenge JUSTICE SPRINGER's participation on the commission. *See* Ainsworth v. Combined Ins. Co., 105 Nev. 237, 259-60, 774 P.2d 1003, 1019 (party waived right to raise allegations of bias where party's counsel knew the subsequently asserted factual basis for allegations and did not promptly tender an objection but remained silent and gambled on the outcome of the proceeding), *cert. denied,* 493 U.S. 958 (1989).

Second, this court has previously rejected a similar challenge by appellant to JUSTICE STEFFEN's participation in this very appeal. *See* Goldman v. Bryan, 104 Nev. 644, 764 P.2d 1296 (1988). Although JUSTICE SPRINGER was not the subject of the specific motion to disqualify resolved in that opinion, the court's

---

[39]Pursuant to Nev. Code of Judicial Conduct Canon 3C(1)(a), "[a] judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where . . . [h]e has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ."

reasoning nonetheless provides persuasive support for the conclusion that a motion for disqualification which is based upon the facts detailed in JUSTICE STEFFEN'S certificate does not raise legally cognizable grounds for JUSTICE SPRINGER'S disqualification from the commission. Nor does it constitute a disqualifying appearance of impropriety under the Nevada Code of Judicial Conduct. If the facts revealed by JUSTICE STEFFEN'S certificate did not require his disqualification from participation in this appeal, neither can it be said to require JUSTICE SPRINGER'S disqualification from the commission. This is especially true in light of JUSTICE SPRINGER'S statement that he played no role in JUSTICE STEFFEN'S initial tentative inquiry.

Third, it is clear from the commission's order that appellant suffered no prejudice whatsoever from JUSTICE SPRINGER'S participation, even assuming that some cause for disqualification or recusal existed. A duly constituted quorum of the commission stated specifically that its deliberations and votes in this matter would be and would have been the same even without the voting participation of JUSTICE SPRINGER. Accordingly, we reject appellant's contentions of prejudicial error as wholly without merit.

## XI. *CONCLUSION*

The commission correctly concluded that appellant committed willful misconduct in office unexcused by any claimed physical or mental disability. Upon the several modifications specified above, we affirm the commission's determination that willful misconduct warranted appellant's removal from office. *See* Nev. Const. art. 6, § 21(6)(a). We reverse and vacate the commission's determination, however, that appellant engaged in habitual intemperance.

We further affirm the commission's determination that appellant voluntarily relinquished and abandoned his office, and we conclude that the commission acted entirely within the ambit of its lawful authority by declaring appellant's office vacant on this basis. Finally, we affirm in all respects the commission's determinations that appellant was not entitled to an early, enhanced disability pension.

STEFFEN and YOUNG, JJ., ZENOFF, Sr. J.,[40] ROBISON, D. J.,[41] and WHITEHEAD, D. J.,[42] concur.

---

[40]THE HONORABLE DAVID ZENOFF, Senior Justice, was designated by the Chief Justice to sit in place of THE HONORABLE ROBERT E. ROSE, Justice. SCR 10.

[41]The Honorable Norman C. Robison, Judge of the Ninth Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE JOHN C. MOWBRAY, Chief Justice. Nev. Const. art. 6, § 4.

[42]The Honorable Jerry Carr Whitehead, Judge of the Second Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE CHARLES E. SPRINGER, Justice. Nev. Const. art. 6, § 4.